**SHELL OIL COMPANY, Appellant,**

**v.**

**George STANSBURY et al., Appellees.**

**No. 6793.**

Court of Civil Appeals of Texas.

Beaumont.

March 31, 1966.

Second Rehearing Denied April 20, 1966.

C. E. Nadeau and R. H. Whilden, Houston, Thos. A. Wheat, Liberty, for appellant.

Fred W. Moore, Houston, Chap B. Cain, Liberty, for appellees.

PARKER, Justice.

The opinion in this cause of March 3, 1966, is withdrawn. This opinion will be substituted therefor and judgment rendered as hereinafter set forth.

George Stansbury and wife sued Shell Oil Company for damages resulting from drainage of oil and gas from their un-

divided ¾ths interest in the oil, gas and minerals in a 506.85 acre tract except as to a 200 foot strip known as the Devers Canal Strip. They also sued for failure of Shell Oil Company reasonably to develop their land. On a jury verdict, the Stansburys recovered damages in the sum of $85,750.-00 as against Shell Oil Company. The Stansburys will be called appellees or Stansbury; Shell Oil Company will be called appellant or Shell.

The plat below will aid in understanding the facts.

Shell Oil Company owned an oil, gas and mineral lease covering H. & T. C. R. R. Survey 161, Abstract 235, with Bill Daniel as lessor. The Bill Daniel wells 1, 2 and 4 are shown upon this plat. The Bill Daniel No. 1 is 467 feet north of the south line of said section. The Bill Daniel No. 4 is 1,303 feet north of the south line of said section. The Bill Daniel No. 2 is 1,651 feet north of the south line of said section and 661 feet east of the west line of said section. No. 3 was a dry hole.

The Bill Daniel wells 1, 2 and 4 were completed in what is called the Yegua Y–3 sand, primarily an oil producing sand.

On the Eliz. G. Miller Survey, Abstract 910, is the location of a producing gas well completed in what is called the Yegua Y–6 sand, a completely different producing horizon than the Y–3 oil sand. On April 19, 1958, the Stansburys, as lessor, executed an oil, gas and mineral lease covering their undivided ¾ths interest in the minerals owned by them in a 506.85 acre tract out of the Thomas J. Evans Survey, providing for a ⅙th royalty on oil and gas to be paid by lessee. Within such 506.85 acre tract is what is known as the Devers Canal Tract 200 feet in width. As to the Devers Canal Tract it was stipulated and agreed as follows:

"It is stipulated and agreed by and between the plaintiffs, George Stansbury and wife, Dorothy Mae Stansbury, Devers Canal Company and Shell Oil Company, for the purposes of this suit plaintiffs will concede and agree that Devers Canal Company owns the minerals in and under the right-of-way which crosses part of the Stansbury land involved in this case, it being particularly agreed and understood that this agreement shall be without prejudice to the claims of plaintiffs in the severed action hereinafter mentioned and that this agreement is made only with reference to this particular litigation."

On March 18, 1959, the Devers Canal Company executed a lease to Shell Oil Company covering the canal strip of 200 feet out of Section 166, which is the Thomas J. Evans Survey, and the Eliz. G. Miller Survey. At the time of the drilling of the Daniel wells 1, 2, 3 and 4 and the gas well on the Eliz. G. Miller Survey, Shell owned leases covering 100% of the minerals on all lands under consideration subject to the royalties in the various leases provided to be paid. Shell acquired these leases directly from the land owners or by assignment from Paul DeMotte. The Stansbury lease had a 320 acre gas pooling agreement. The Bill Daniel lease had no pooling agreement. The Rich lease covering the Eliz. G. Miller had a 320 acre gas pooling agreement.

The jury findings are:

1. Shell Oil Company drained condensate, oil and gas from the Yegua Y–3 sand in the Stansbury land through Shell Oil Company's Bill Daniel Nos. 1 and 4 wells during the period extending from about July 1, 1960, up to September 1, 1964.

2. The amount of condensate, oil and gas drained from Stansbury land by Shell through its Bill Daniel Nos. 1 and 4 wells July 1, 1960 to September 1, 1964, amounted to 77,000 barrels of oil and 196,000 thousand cubic feet of gas.

3. A reasonably prudent operator would have drilled a well on the Stansbury land to prevent drainage of condensate, oil and gas through Shell Oil Company's Well No. 1 on the Bill Daniel tract on or before July 1, 1960, after the Bill Daniel No. 1 began to produce oil and gas in paying quantities.

In answering the above special issue the jury was charged:

"In connection with your answer to this special issue, you are charged that a reasonably prudent operator is not obligated to prevent drainage of minerals, if any, that is oil, gas and condensate, if any, from his lessor's land through said lessee's well or wells on adjoining land unless a reasonably prudent operator with

knowledge of the risks involved not owning the draining wells would protect against such drainage by drilling a well and also not unless a reasonably prudent operator would have a reasonable expectation of producing minerals, if any, that is oil, gas or condensate, if any, from such contemplated well in paying quantities. The term 'paying quantities' as used in this charge, means production of minerals, if any, from such contemplated well in such quantities that would give the lessee a profit after deducting the costs of drilling, operating and marketing, including but not limited to, production taxes payable by the operator to the State of Texas on ⅝ths of the production, all ad valorem taxes payable on the operator's interest in the lease and also all penalties, if any, due by the producer on account of overproduction of gas by the operator in violation of rules of the Texas Railroad Commission. You are likewise charged that the term 'reasonably prudent operator' as used in this charge, means an operator of ordinary prudence, that is having neither the highest nor the lowest prudence, but on the contrary an operator of average prudence and intelligence, acting with ordinary diligence under the same or similar circumstances."

4. Such well inquired of in 3 above would have been drilled by a reasonably prudent operator on or before April 5, 1961.

5. A reasonably prudent operator would have drilled a well on the Stansbury land to prevent drainage of the condensate, oil and gas through Shell Oil Company's Well No. 1 on the Bill Daniel tract on or before January 10, 1962, after the Bill Daniel No. 1 began producing oil and gas in paying quantities. The same instruction as to "reasonably prudent operator" and "paying quantities" were given to the jury in answering this last issue as in 3.

6. A well drilled on the Stansbury land would have produced between July 1, 1960 to September 1, 1964, 193,000 barrels of oil and 493,000 thousand cubic feet of gas.

7. A well drilled on the Stansbury land from April 5, 1961 to September 1, 1964, would have produced 129,000 barrels of oil and 345,000 thousand cubic feet of gas.

8. From January 10, 1962 to September 1, 1964, a well on the Stansbury land would have produced 83,000 barrels of oil and 225,000 thousand cubic feet of gas.

9. The market value of condensate, oil and gas produced from the Stansbury land if a well had been drilled thereon from July 1, 1960 to September 1, 1964, would have been $686,000.00.

10. A well on the Stansbury land from April 1, 1961 to September 1, 1964, would have produced condensate, oil and gas of a value of $458,000.00.

11. From January 10, 1962 to September 1, 1964, such a well on the Stansbury land would have produced condensate, oil and gas of a value of $293,000.00.

Appellant's 1st point of error is as follows:

"The Court erred in not giving effect to the lease provision pertaining to the drilling of offset wells. The last sentence of paragraph 6 of the lease provides, in effect, that the obligation to drill offsetting wells does not arise until there is a well on adjacent land within offset distance as fixed by the spacing rules of any government body having jurisdiction of the filed. Under the stipulated facts and undisputed evidence, there was no such well. In the alternative, there was no such well until the effective date of the Special Field Rules."

The last sentence of paragraph 6 of the lease is the offset provision and is as follows:

"In the event a well or wells producing oil or gas in paying quantities should be

brought in on adjacent land and within offset distance as fixed by the spacing rules of any governmental regulatory body having jurisdiction for the field in which said well is located and draining the leased premises, or acreage pooled therewith, Lessee agrees to drill such offset wells as a reasonably prudent operator would drill under the same or similar circumstances."

■ The Railroad Commission Statewide Rules were in effect until January 10, 1962, at which time Special Field Rules went into effect. The lease was entered into in contemplation of the Statewide Railroad Commission Rules then in force and the power of the Railroad Commission in the future to regulate the operation and production from this lease and other leases in the area. Butler v. Jenkins Oil Corp., 128 Tex. 356, 97 S.W.2d 466 (1936); Haby v. Stanolind Oil and Gas Co., 228 F.2d 298 (Fifth Circuit 1955). Appellant completed the Bill Daniel No. 1 well as an oil discovery in the Yegua Y–3 sand July 1959. This well is located 467 feet north of the north line of the land described in the lease from appellees. In March of 1960 the production of oil from Bill Daniel wells Nos. 1 and 2 began. Each were producing from the Y–3 oil sand. The Statewide Field Rules in effect at the time such Bill Daniel wells were brought in as producers and were producing provided:

"No well for oil or gas shall be drilled nearer than nine hundred thirty three (933) feet to any well completed in or drilled to the same horizon on the same tract or farm, and no well shall be drilled nearer than three hundred thirty (330) feet to any property line, lease line or subdivision line."

■ Appellant contends that the provision that no well shall be drilled nearer than 330 feet to any property line, lease line or subdivision line was an offset distance. We do not consider it so to be. It is a spacing rule but not an offset distance for the purpose of determining the obliga-

tion of the lessee to drill an offset well. Under appellant's contention, it, as the owner of the Bill Daniel lease, had to violate a rule of the Railroad Commission on the Bill Daniel lease as a condition precedent to appellant being obligated to drill an offset well on appellees' land. The law will not enforce an agreement to do that which the same law says will not be done. Such construction as urged by appellant would be ineffective under Texas Employers' Ins. Ass'n v. Tabor, Tex.Com. App., 283 S.W. 779; Lewis v. Davis, 145 Tex. 468, 199 S.W.2d 146 (1947); Hennessy v. Automobile Owners' Ins. Ass'n, 282 S.W. 791, 46 A.L.R. 521 (Tex.Com. App., Sec. A, 1926, opin. adopted by S.Ct.); American Nat. Ins. Co. v. Tabor, 111 Tex. 155, 230 S.W. 397 (1921); Labbe v. Corbett, 69 Tex. 503, 6 S.W. 808.

■■ Under the above authorities, the offset provision should be construed as requiring a legal act if such construction is possible and logical. The Statewide Rules had no *offset distance*. Any well on the Bill Daniel lease under the Statewide Rules would be within *offset* distance as fixed by the spacing rules of such governmental regulatory body. Therefore, under governmental regulations in force at that time appellant could lawfully drill such offset well or wells on appellees' land as a reasonably prudent operator would drill under the same or similar circumstances, subject to such offset well or wells on appellees' land not being located within 933 feet of any completed well or within 330 feet of any property line, lease line or subdivision line.

■ A lessor and lessee may contract so that lessee is never under obligation to drill an offset well. To so contract, however, the language must be very clear. In this lease there is no contract that lessee shall not be under obligation to drill an offset well. The offset clause under consideration recognized that under the Statewide Field Rules no maximum offset distance had been fixed but that in the future

governmental authority could have a rule fixing a maximum offset distance. There being no offset distance fixed by any governmental authority, Shell was obligated to drill such offset wells as a reasonably prudent operator would drill under the same or similar circumstances on the Stansbury land to protect it from drainage whether it owned leases on adjoining land or not. Appellant's first point of error is overruled.

Appellant's second point of error is:

"The Trial Court erred in not recognizing and giving effect to the partial release executed by Shell Oil Company dated March 15, 1961, recorded March 24, 1961. Said partial release pertained to the Yegua Y–3 sand, the only formation in controversy, as to the lease executed by Appellees, the leases executed by the owners of the outstanding ¼ minerals interest, the Devers Canal lease, and other leases."

On March 15, 1961, Shell released the Stansbury lease of April 19, 1958, insofar as said lease covered and applied to the Yegua Y–3 sand. This instrument was filed for record March 24, 1961. Appellees contended in the trial court and in this court:

"Under the terms of the lease Appellant had no right to release only one sand under Appellees' land covered by the lease because the release clause as written in the lease pertains to acreage and it is necessary that the release be by acreage and not by horizons or sands. By the terms of the lease Appellant could pool or unitize horizontally by sands but under the provisions of the lease it could release only vertically or by acres."

Actually, pooling was limited to gas.

In the lease from appellant of April 19, 1958, the pertinent provisions as to release are:

"3. * * * Nothing herein shall impair Lessee's right to release as provided for in Paragraph 5 hereof. * * *"

"5. * * * Lessee may at any time or times execute and deliver to Lessor or to the depository above named or place of record a release or releases covering any portion or portions of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered, and thereafter the rentals payable hereunder shall be reduced in the proportion that the acreage covered hereby is reduced by said release or releases."

Paragraph 4 is typewritten, and not printed, and provides:

"4. Lessee is hereby granted the right, at its option, to pool or unitize all or any part of the above described land and of this lease as to any or all horizons thereunder, with other lands, lease or leases, or portion or portions thereof, or horizon or horizons thereunder, so as to establish units pooled for gas and containing not to exceed the following number of acres per unit: 320 acres for production from a gas well completed below a depth of 9,000 feet from the surface. Should governmental authority having jurisdiction prescribe the creation of units larger than those specified, any such unit may be established or enlarged to conform in size with those prescribed by Governmental regulations. The first pooled unit established pursuant to the provisions of this paragraph shall include not less than 160 surface acres out of the above-described land covered by this lease. Lessee shall file for record in the office of the County Clerk of the County in which the leased premises are situated an instrument described and designating the pooled acreage as a pooled unit. Lessee may, at its election, exercise its pooling option hereunder after commencing operations for or completing a gas well on the leased premises or on other land pooled therewith, and the pooled unit may include, but is not required to include, land or leases upon which a well capable of producing gas

in paying quantities had theretofore been completed or upon which operations for the drilling of a well for gas have theretofore been commenced. Operations for drilling on or production of gas from any part of a pooled gas unit which includes all or a portion of the land covered by this lease, regardless of whether such operations for drilling were commenced or such production was secured before or after execution of the instrument designating the pooled unit, shall be considered as operations for drilling on or production of gas from land covered by this lease, whether or not the well or wells be located on the premises covered by this lease, and the entire acreage constituting each such unit shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if the same were included in this lease. For the purpose of computing the royalties to which owners of royalties and of gas from the pooled unit, there shall be allocated to the land covered by this lease and included in said unit a pro rata portion of the gas produced from the pooled unit, after deducting that used for operations on the pooled unit. Such allocation shall be on an acreage basis— that is to say, there shall be allocated to the acreage covered by this lease and included in the pooled unit that pro rata portion of the gas produced from the pooled unit which the number of surface acres covered by this lease and included in the pooled unit bears to the total number of surface acres included in the pooled unit. Royalties hereunder shall be computed on the portion of such gas production so allocated to the land covered by this lease and included in the unit as if such production were from such land. As used in this paragraph, 'gas' means all of the production, both gaseous and liquid, produced from a well which is classified as a gas well by the Texas regulatory body having jurisdiction."

In construing the written or typewritten provisions of this lease, effect is given to them over printed provisions. McMahon v. Christmann, 157 Tex. 403, 303 S.W.2d 341, 344, 304 S.W.2d 267. Provisions in the lease when apparent conflict must be reconciled and harmonized whenever possible by reasonable interpretation so that the contract as a whole may be given effect. The duties of appellant to develop and to protect the leased premises from drainage exists as to each reservoir or stratum or horizon or sand lens containing sufficient oil and gas to invoke such obligations, express or implied. Clifton v. Koontz, 160 Tex. 82, 325 S.W.2d 684, 79 A.L.R.2d 774; Railroad Commission v. Shell Oil Company, Tex., 380 S.W. 2d 556 (1964).

During the primary term in the absence of production or drilling operations at the option of the lessee the lease could be maintained by the payment of rentals, which rental could be reduced by releases of part of the acreage as provided in that portion of Paragraph 5 quoted above. This is not the problem before this court.

In paragraph 5, the word "acreage" in the same sentence cannot have different meanings without a clear explanation of the application of different meanings. There is no such explanation. Delay rentals could only be reduced by a release of acreage although the first part of the sentence provides for a "release or releases of any portion or portions of the above described premises". This means that the release must be of any portion or portions of the acreage of the above described premises. An acre is a measure of land measured on the surface of the land but including the earth beneath to the center of the earth. The release provision must be construed as written. In releasing and surrendering the lease, Shell had to comply with the specific provision for

surrender and release. Shell in its brief states:

> "Appellees had not requested or demanded a release, their only demand being the letter of January 3rd, 1961, representing the drilling of an offset well."

Actually, appellees in that letter demanded the drilling of an offset well.

Acreage denotes a number of acres of land. A release of a part or portion of a number of acres of land would have reduced the number of acres retained by the lessee. The Shell releases of the Y–3 sand horizon did not reduce the number of acres covered by the lease. The measurement factor in the word acreage was ignored. The Y–3 sand releases were not authorized by the lease contract, hence void. Such limited releases could not be effective except by mutual agreement of Shell and the Stansburys. This did not occur. Appellant's second point of error is overruled.

Appellant's 10th point of error is as follows:

> "The Trial Court erred in not recognizing and giving effect to the legal requirement of notice to the lessee before an action of this type accrues, which requirement is made definite by a lease provision concerning the giving of notice by the lessor. This error extended to the admission of evidence, the charge of the Court and the judgment."

Trial of the instant suit began September 30, 1964. Prior thereto, on September 23, 1964, Shell released all of its right, title and interest in the Stansbury lease of April 19, 1958. The trial court judgment denied all relief except the recovery of damages by appellees against appellant "for its failure and refusal to so protect plaintiffs' land from drainage in the sum of $85,750.00, representing one-eighth (⅛th) of the market value of the minerals which said Stansbury' well would have produced as found by the jury, * * *."

Thus, as tried, this was a suit for damages and not a suit to forfeit, cancel and terminate the Stansbury lease. Paragraph 9 of the lease provides:

> "9. The breach by Lessee of any obligation arising hereunder shall not work a forfeiture or termination of this lease nor cause a termination or reversion of the estate created hereby nor be grounds for cancellation hereof in whole or in part. In the event Lessor considers that operations are not at any time being conducted in compliance with this lease, Lessor shall notify Lessee in writing of the facts relied upon as constituting a breach hereof, and Lessee, if in default, shall have sixty days after receipt of such notice in which to commence the compliance with the obligations imposed by virtue of this instrument."

Appellant urges that notice and demand under the above quoted paragraph were required before suit for damages could be filed for failure to protect appellees' land from drainage and failure to drill wells. General Crude Oil Co. v. Harris, 101 S.W. 2d 1098, 1101 (Tex.Civ.App.1937) holds that in a suit to recover damages for failure to develop reasonably, notice is not a prerequisite to liability. This view is sustained in Foster v. Atlantic Refining Co., 5 Cir., 329 F.2d 485 (n. w. h.). Appellant's 10th point is overruled.

Appellant's 12th point of error is as follows:

> "The finding on Special Issue No. 3, which is one of the issues on which the judgment is based, is not supported by any evidence, or, in the alternative, is contrary to the great weight and preponderance of the evidence."

In Special Issue No. 3 the jury found that a reasonably prudent operator would have drilled a well on the Stansbury land to prevent drainage of minerals; i. e., oil, gas or condensate, through Shell Oil Company's well on the Bill Daniel tract on or before July 1, 1960, after the Bill Daniel No. 1

began to produce oil and gas in paying quantities. Bill Daniel No. 1 well was completed July 6, 1959, in the Y–3 sand. Bill Daniel No. 2 well was completed September 24, 1959, and both wells were producing in paying quantities. Daniel No. 3 was completed as a dry hole October 18, 1959. By the end of 1959 appellant, through the drilling of such wells, had knowledge of the nature of the field, the thickness of the Y–3 sand, the pressures to be encountered. The limit of the field to the north had been defined by the dry hole and to the west by a well on the Davis tract. On July 17, 1959, the Bill Daniel No. 1 was flowing through a %4ths inch choke, bottom hole pressure 8,885 pounds. On July 17 to July 20, 1959, the company made a subsurface pressure survey of the well. A further such test was made on March 7, 1960. Houston laboratories made tests from reservoir analysis of samples of liquid and gas from the Bill Daniel No. 1 well showing the viscosity of reservoir fluid, pressures, vaporization data, etc. Voluminous testimony as to these tests is in the record. Appellees' experts testified that a reasonably prudent operator would have drilled a well on the Stansbury land by July 1, 1960. Bill Daniel No. 1 had been a producer or capable of producing large amounts of oil and gas from July 7, 1959. Bill Daniel No. 2 had been producing or had been capable of producing since September 24, 1959. The geologist, Cantrell, testified it would take approximately 30 days to drill and complete a well on the Stansbury land into the Y–3 reservoir. The estimated cost of same would run between $180,000 to $190,000. He testified that from July 1, 1960, to September 1, 1964, in his opinion such well would have produced 193,140 barrels of oil and 493,862 MCF of gas. Poynor, consulting petroleum engineer, estimated the total production acreage in the Y–3 reservoir at 383 acres, of which 73 acres were in the north part of the Stansbury tract and 240 acres in the south part of the Bill Daniel tract. Seventy acres he estimated to be in the Davis tract. According to his estimate, the Bill Daniel tract would have 77.8 per cent of the

Y–3 sand reservoir and the Stansbury tract 15.1 per cent. He testified that at the time of the trial 10½ billion cubic feet of gas and approximately 1,292,000 barrels of oil remained in the reservoir of the Y–3 sand, that only 25 per cent of the oil had been produced from the reservoir and only 10 per cent of the gas. He further testified that in his opinion gas having a net value of $29,400 and oil having a value of $245,000 or a total of $274,400 in value had been drained from the Stansbury land through the Bill Daniel wells Nos. 1 and 4. William P. Swearingen, a petroleum engineer, testified from the evidence above outlined that he would have drilled a well on the Stansbury land on or before July 1, 1960; that he would drill a well on it at the time of trial except for this lawsuit. He testified that in his opinion a well on the Stansbury tract from July 1, 1960, to September 1, 1964, would have produced approximately 190,000 barrels of oil and approximately 500,000 MCF of gas. Appellants' senior production geologist testified that the Bill Daniel No. 1 was draining from the Stansbury land, there being nothing to prevent Bill Daniel No. 1 from draining within a radius of 2,320 feet. The Shell petroleum engineer, Miller, testified against the existence of any oil in the Stansbury land but did testify that in his opinion in this field the recovery of oil under the water drive would be about 60 per cent of the total oil in place, the original recoverable reserves being 1,226,000 barrels.

In obtaining an order by the Railroad Commission of the State of Texas establishing the special field rules, Shell on January 3, 1962, filed certain exhibits and furnished testimony before that body in support of its application for the adoption of the special field rules. Included was an interference test on the Yegua Y–3 sand establishing that a well 2,320 feet from another producing well in this reservoir when shut-in was drained by the other well which was producing. One report stated:

"Test shows that a well is capable of draining in excess of 80 acres with the

radius of an 80 acre circle being 1,053 feet and the area of a circle of 2,320 feet radius is 388 acres."

Based upon this testimony and exhibits, the special field rules were established with producing units increased to 80 acres from 20 acres. The production history furnished on the Y–3 sand before the Railroad Commission showed that the Daniel producing wells were producing oil in substantial paying quantities.

◼ In considering the "no evidence" contention that Special Issue No. 3 was not supported by any evidence that part of the record most favorable to appellees is controlling and appellant's contention is overruled. In considering that part of appellant's point of error contending that the jury finding as to Special Issue No. 3 was contrary to the great weight and preponderance of the evidence the entire record and all evidence is reviewed. The finding of the jury thereon is not so contrary to the overwhelming weight and preponderance of the evidence as to be manifestly unjust and, accordingly, that portion of such point is overruled.

◼ Appellant's 11th point of error is as follows:

"The Trial Court erred in not having the jury determine what would have been a reasonable time within which a lessee should have drilled and completed a well after the obligation, if any, accrued."

Appellant's 13th point of error is as follows:

"The Trial Court erred in refusing to have the jury determine where a reasonably prudent operator would have drilled on Appellees' land."

Points 11 and 13 will be considered together. Appellant did not request the trial judge to submit an issue as to either of the above matters. Appellant cites no authorities in support of its complaint. Substantially, the matters complained of were evidentiary and not ultimate issues. Appellant's 11th and 13th points of error are overruled.

◼ Appellant's 9th point of error is as follows:

"The Trial Court erred in failing to properly instruct the jury that for the drilling of an offset well a reasonably prudent operator is entitled to a reasonable profit. The definition of 'paying quantities' included in the instruction is an adaptation of the definition applied to the habendum clause of a lease and is not appropriate for the drilling of offset wells. As given, the definition is satisfied if there is any profit, however small. As defined, the profit could become a loss because not all expenses or deductions are included and because, under the pleadings, plaintiffs owned only a ¾ interest in the minerals."

The above asserted error relates to Special Issue No. 3 and the instruction in connection. Appellant correctly contends:

"that a reasonably prudent operator for oil and gas would, taking into consideration the surrounding circumstances, expect the proposed well to produce in paying quantities. The term 'paying quantities' as used in this connection means such quantities as would yield to the lessee a reasonable profit after deducting the entire cost of drilling, equipping and operating the well or wells,"

and the royalties payable to the lessors as well as the deductions mentioned in the court's charge as given in this case.

Shell had all minerals in the 506.85 acres under lease burdened with a ⅛th royalty on oil and gas to be paid by lessee (Shell) to the lessors in proportion to their respective interest. Part of the instruction in connection with Special Issue 3 is:

"The term 'paying quantities' as used in this charge, means production of minerals, if any, from such contemplated well in such quantities that would give the lessee a profit after deducting the costs of drilling, operating and marketing, including

but not limited to, production taxes payable by the operator to the State of Texas on ⅝ths of the production, all ad valorem taxes payable on the operator's interest in the lease and also all penalties, if any, due by the producer on account of over-production of gas by the operator in violation of rules of the Texas Railroad Commission."

The costs of drilling, operating and marketing includes (a) the cost of equipping the well for production, (b) the payment of the total ⅛th royalties on oil and gas, and (c) many other expenses that could be itemized at great length. The instruction to the jury required that in answering Special Issue No. 3 all of such costs and payments be deducted in arriving at their answer.

Appellant's 9th point of error is overruled.

Appellant's 3rd point of error is as follows:

"The Court erred in not holding that under the express development provision of the lease Appellant had drilled all required wells on the acreage covered by the Rich-Stansbury 320-acre gas unit."

In August 1960 Shell commenced drilling the Rich-Stansbury unit well No. 1 which was completed as a gas well in the Y–6 sand December of 1960. Shell formed a 320 acre gas unit as to the Y–6 sand on December 31, 1960. This 320 acre gas unit included the north 140 acres covered by the Stansbury lease. The Y–6 gas sand was an entirely different producing horizon, stratum or lens from the Y–3 oil sand. As stated in Clifton v. Koontz, 325 S.W.2d 684, each separate productive stratum or horizon is entitled to separate development. The contention that all required wells on the acreage covered by the Rich-Stansbury 320 acre gas unit had been drilled by Shell ignores the duty of Shell to drill offset wells to the Y–3 oil sand on the Stansbury

land and to develop that sand reservoir on the Stansbury land. As stated in Clifton v. Koontz, supra, there is no implied obligation to explore as to oil, gas and minerals leases in Texas. Exploration is for the purpose of discovery. After discovery of oil, gas or other minerals in paying quantities, the obligation to reasonably develop comes into being. In March 1960 appellant commenced production from Daniel wells Nos. 1 and 2. They were in the Y–3 oil sand. The jury found that Shell's Bill Daniel wells 1 and 4 drained condensate, oil and gas from the Y–3 sand from under the Stansbury land from about July 1st until September 1, 1964, and that a reasonably prudent operator would have drilled a well on the Stansbury land to prevent drainage of condensate, oil and gas through Shell's well No. 1 on the Bill Daniel tract on or before July 1st, 1960. Appellant's point of error No. 3 is overruled.

Appellant's 4th point of error is as follows:

"In the alternative and regardless of the validity of the release of March 15, 1961, Appellees should have given Appellant (a) notice within a reasonable time of their claim that the release was ineffective and (b) an opportunity to give a further or complete release. Until this was done the release was valid or should have been deemed valid."

Stansbury testified he never agreed to the release of March 15, 1961. He made no transaction relying upon the void release. Appellant argues that it placed no burden on Stansbury, contending in effect that it was a gift and was beneficial to Stansbury to accept it. It was simply an illegal attempt on the part of Shell to relieve itself of the duty to drill an offset well on the Stansbury land demanded by Stansbury to stop further damages accumulating against it. Under such circumstances there is no presumption of acceptance by Stansbury of such void and unauthorized release. No one can be presumed to do that

which is not to his advantage. Appellant's 4th point of error is overruled.

■ Appellant's 5th point of error is:

"The Trial Court erred in not recognizing and giving effect to the release dated November 6, 1963. This release covered all of Appellant's interest in the lease except as to the unit (Yegua Y-6) formation. As reflected by the judgment, the Trial Court ruled that this release was not authorized by the lease. This ruling is erroneous as a matter of law and because (a) Appellees made no claim or allegation that this release was invalid or ineffective, (b) Appellees' trial pleadings assert that it is proper and pray that the Court hold that Appellees' land be freed of claims pursuant to the releases, and (c) it complies with Appellees' written demand."

Stansburys filed their suit on December 31, 1962. Almost a year later, on November 6, 1963, Shell executed a release as to all horizons in the Stansbury land except the Y-6 gas sand in the north 140 acres. The trial court properly found "that the releases executed by defendant dated March 15, 1961, and November 6, 1963, were not authorized by plaintiffs' lease." Trial of the instant suit commenced in the trial court on September 30, 1964. Prior thereto, on September 23, 1964, Shell released all of its right, title and interest in the Stansbury lease of April 19, 1958. This release was of the Y-6 sand as well as of all other sands. Under these circumstances the purported release of November 6, 1963, was not in response to any demand of appellees reflected in letters of their attorney dated November 15, 1962, and November 16, 1962. This November 6, 1963, release was executed and filed for record by Shell almost one year subsequent to the institution of the present suit by the Stansburys. On May 20, 1964, George Stansbury in his affidavit in opposition to the motion for summary judgment filed by Shell Oil Company plainly stated he was not asking

for cancellation of the lease but for damages, and further stated:

"At no time has this plaintiff ever indicated any waiver of his right to have his land protected from drainage from the Bill Daniel wells as described in his petition nor has he waived his right in any way to have the premises reasonably developed after production was obtained from the unit. At no time has plaintiff indicated that he accepted the release of the Yegua Y3 sand as a settlement of the covenants mentioned, it being plaintiff's contention that the abandonment of the Yegua Y3 sand alone did not release the lessee, that is the Shell Oil Company, from any obligation to protect the land from drainage or from any obligation to reasonably develop same."

Shell's motion for summary judgment was refused July 2, 1964.

Appellant's 5th point of error is overruled.

■ Appellant's 6th point of error is:

"Appellees, having failed to prove and having failed to obtain a jury finding that Appellant in any way prevented the drilling of a well on their land, have not established a cause of action for damages resulting from the failure of Appellant to drill an off-set well."

The answer to this point of error is simple. There is nothing to show why appellant didn't drill the offset well except that it did not want to and did not do so. Shell was the owner of the Stansbury lease. The point of error is overruled.

■ Appellant's 7th point of error is as follows:

"The Trial Court erred in failing to recognize that Appellees had no interest in the minerals in the Devers Canal tract. By stipulation these minerals were own-

ed by Devers Canal Company. Despite the stipulation, over Appellant's objection Appellees were permitted to introduce exhibits and to present testimony on productive acres, well locations and drainage on the basis that the minerals in said tract belonged to Appellees. The jury findings are based on testimony which included the canal tract in Appellees' land. There is no evidence to support the findings or, in the alternative, they are contrary to the great weight and preponderance of the evidence."

Appellant's 8th point of error is as follows:

"Since production from the proposed well could not exceed the allowable as set by the Railroad Commission, the Trial Court erred in not instructing the jury on the method that they should use to calculate or determine such allowable. Under the Special Field Rules, allowable is determined by the 'continuous and contiguous acreage which can reasonably be considered to be productive of oil.' The jury should have been requested to find the number of continuous and contiguous productive acres in the Y–3 sand under the Stansbury land exclusive of the Canal. The jury findings on Special Issues Nos. 6 through 11 are based on a full 80-acre allowable but there is no basis for such an allowable under the evidence or under Appellees' pleadings that their land was 'largely depleted' in November 1963. There is no evidence to justify such findings or, in the alternative, the findings are against the great weight and preponderance of the evidence."

The 7th and 8th points of error are considered together. The stipulation as to the Devers Canal tract was in evidence. The expert, Cantrell, and other experts testifying in behalf of appellees, recommended three different locations on the Stansbury land. The location of the Devers Canal Company right-of-way was drawn on the map from which Mr. Cantrell and Mr. Poy-

nor testified. The experts in their opinion considered a well drilled on the Stansbury land would be as good as the Bill Daniel No. 1, indicating that it would drain part of the Canal Company right-of-way which under the law of capture, it could rightfully do. Poynor estimated that there might be 10 to 13 acres of the Devers Canal Company right-of-way included in his estimate. Under the rules of the Texas Railroad Commission dated June 20, 1957, revised June 24, 1957, Poynor was justified in including the Devers Canal Company right-of-way in his estimate, such memorandum reading as follows:

"Proration and drilling units established for individual wells drilled or to be drilled shall consist of acreage which is contiguous and can reasonably be considered to be productive of oil or gas.

"An exception to the contiguous acreage provision may be granted, at the operators' election, when acreage that is to be included in such proration or drilling unit may be separated by a long, narrow right-of-way tract.

"Where a right-of-way traverses such a proposed unit and the fee title of the right of way is established in another party, and such right of way causes a separation of acreage into non-contiguous tracts described, at the operators' election, may be assigned to a proration or drilling unit as an exception to the accepted non-contiguity rule; provided that the amount of acreage within the right of way within said unit shall be deducted from the total acreage assignable to the unit unless and until, if the title to such right of way is in question, such time as that acreage is either found to belong to the operator or is unitized by the interested parties."

In explanation of the suggested Stansbury wells and to support the testimony of appellees' experts, a plat was introduced in evidence showing the contours on top of the

Y-3 sand at 50 foot intervals. It was marked up by various witnesses as a result of examination and cross-examination by such experts. These experts testified as to 20 acre units, as to 80 acre units, as to allowables including discovery allowables and as to the periods of time such regulations, respectively, were in force.

The stipulation as to the Devers Canal Tract and the existence of such strip did not prevent drainage of oil by the Daniel wells from the Stansbury land.

The number of continuous and productive acres in the Y-3 sand under the Stansbury land exclusive of the canal was not an ultimate issue.

■ All calculations of appellees' experts as to production an offset well would produce were based on the allowables of the Railroad Commission for respective periods in question on the producing units authorized.

Also the calculations are in accordance with the actual authorized production from the Bill Daniel wells.

■ In considering the "no evidence" contentions in Special Issues 7 and 8 that part of the record most favorable to appellees is controlling and appellant's contention is overruled. In considering that part of appellant's points 7 and 8 contending that the findings of the jury are contrary to the great weight and preponderance of the evidence, the entire record and all evidence is reviewed. The findings of the jury thereon are not so contrary to the overwhelming weight and preponderance of the evidence as to be manifestly unjust and, accordingly, that part of such points 7 and 8 are overruled.

Judgment of the trial court affirmed.

Appellant's Motion for Rehearing overruled.