NO. 07-01-0263-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL D

JANUARY 28, 2002

_____


KERR-MCGEE CORPORATION, ET AL., APPELLANTS

V.

JIMMY HELTON, ET AL., APPELLEES


_____

FROM THE 31ST DISTRICT COURT OF WHEELER COUNTY;

NO. 10,680; HONORABLE STEVEN R. EMMERT, JUDGE

_____

Before BOYD, C.J., and QUINN and REAVIS, JJ.


In three issues, appellants Kerr-McGee Corporation, Kerr-McGee North American

Onshore Corporation, Devon Energy Corporation (Nevada) and Devon Energy Production,

L.P.[1] (hereinafter collectively referred to as Kerr-McGee) appeal from a judgment after a

_____

[1]Kerr-McGee Corporation assigned the leases which are the subject of this lawsuit to its subsidiary, Kerr-McGee North American Onshore Corporation, and later there was a merger with Devon Energy Corporation (Nevada), after which the entity became Devon Energy Production Company, L.P.

bench trial finding that they breached an implied covenant in oil and gas leases to protect against drainage. Appellees are the lessors under those oil and gas leases.[2] For the reasons explicated, we affirm the judgment of the trial court.

Appellees alleged at trial that Kerr-McGee should have drilled a well at a specific location in Section 10, Block RE, Roberts & Eddleman Survey, Wheeler County, Texas, to protect the Lower Puryear formation under their leases from gas drainage by the Holmes 17-1 well located in the NW/4 of Section 17 which is directly south of Section 10. The leases had been unitized into a single gas unit covering all of Section 10. Kerr-McGee owned leases covering Sections 9, 10, 11, 16, 17 and 18, Block RE, Roberts & Eddleman Survey, Wheeler County, Texas, as well as other sections in the area. At the time the leases were obtained, there were no producing wells anywhere in the area. On December 4, 1993, the Holmes 17-1 well was completed by Kerr-McGee at a location 660 feet from the north and west lines of Section 17. The well produced from the Lower Puryear interval in the Upper Morrow formation of the Anadarko Basin. This was the first time that the Lower Puryear zone had ever been encountered. The initial producing rate was 8,000 Mcf per day.

The first offset well, the Mary Mitchell 10-1, was completed on April 21, 1994, in Section 10 at a location 2,500 feet from the west line and 1,600 feet from the south line. The well did not encounter any Lower Puryear zone and was eventually completed in the Granite Wash formation as a well that would never pay out. Kerr-McGee then completed

_____

[2]The appellees include 69 individuals, estates, and trusts.

a well, the Eden 11-1, in Section 11, which was directly west of Section 10, at a location 467 feet from the south and east lines. There was a thin section of Lower Puryear in that well, and the well was eventually completed on January 10, 1995, in the Puryear zone, which is a formation just above the Lower Puryear. The well will make a reasonable profit.

Having failed to encounter a profitable Lower Puryear zone in its first two offset wells, Kerr-McGee then waited for the results of a seismic survey, which was completed in 1995. Based on that survey, two additional wells were drilled. The Zybach 16-1 well was spudded on February 25, 1996, at a location 2,640 feet from the east line and 980 feet from the south line of Section 16, which is located southwest of Section 10. No productive Lower Puryear was found and the well was completed in the Atoka formation as a marginal producer. Then a second well, the Mary Mitchell 10-2, was drilled in Section 10 at a location 467 feet from the south line and 2,300 feet from the west line. There was a thin layer of Lower Puryear in the well, and it was completed on June 11, 1996, in the Lower "A" Chert, Puryear, and Lower Puryear as a well which will never pay out. The Fleetwood Trust 16-1 well was completed next on December 1, 1996, in Section 16 in the Lower Puryear and has been a profitable well. Kerr-McGee drilled three more wells in 1997 and 1998, including the Reid 9-1 in Section 9, the Zybach 16-2 in Section 16, and the Holmes 17-2 in Section 17, but none of the wells encountered a productive Lower Puryear zone.

It was appellees' contention that Kerr-McGee breached the implied covenant under the leases to protect Section 10 from drainage from the Holmes 17-1 well in the Lower Puryear zone by drilling and completing a well 467 feet from the south line and 660 feet

from the west line of Section 10 by January 31, 1995. The trial court agreed and awarded appellees a total amount of $1,432,618.11 in damages, consisting of $840,910.51 for drainage to March 16, 2001, $190,068.75 in prejudgment interest from January 8, 1999, through April 12, 2001, $22,738.85 for future drainage after March 16, 2001, and $378,900 in attorneys' fees.

Kerr-McGee complains that the trial court erred in (1) denying its motion to strike the opinion of appellees' expert witness, Michael Riley, as to the amount of damages, because his opinion was not based on a reliable factual foundation; (2) denying its motion for judgment at the close of appellees' case, its motion at the close of all evidence, and its motion to reform the judgment because there was no competent evidence to support the damages awarded by the trial court; and (3) the award of prejudgment interest because there is no evidence and no findings of fact upon which prejudgment interest can be based.

A claim of improper operation by a lessor against a lessee must be measured against what a reasonably prudent operator would do under similar facts and circumstances to carry out the purposes of the oil and gas lease. *Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 568 (Tex. 1981). To prove a breach of the implied covenant to protect against drainage, a lessor must prove the land is being drained, the drainage is substantial, and a protection well would encounter the formation allegedly being drained and would produce oil or gas in paying quantities. *Id.* at 572. The responsibilities of the lessor to a particular lessee are not reduced because the lessor has other leases in the same field. *Id.* at 569.

In its first issue, Kerr-McGee claims that the trial court erred in denying its motion to strike the opinion testimony of expert Michael Riley as to damages because it was not based on a reliable factual foundation. In response, appellees assert that Kerr-McGee failed to object or timely move to strike the opinions of Riley as to damages and therefore waived its complaint or, alternatively, his opinions are adequate under Texas law. At the conclusion of Riley's direct testimony and cross-examination, Kerr-McGee moved to strike the testimony on the basis that his opinion as to damages did not have a factual foundation and that his opinion was based on what the protection well would have produced as opposed to the amount of gas drained which, Kerr-McGee argues, is the proper measure of damages. The motion was denied. Later, Riley was recalled to testify as to the amount of drainage. Before cross-examining Riley, Kerr-McGee moved again to strike his testimony on the basis that there were no facts to support the opinion. The court remarked that Kerr-McGee had already allowed Riley to render his opinion. Riley then gave additional testimony as to how he arrived at his opinion, and the court overruled the motion to strike. Kerr-McGee also failed to object to the admission of Plaintiff's Exhibit 21, which is an analysis of the royalty cash flow that would have resulted from production from the protection well if drilled.

Appellees rely on *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402 (Tex.), *cert. denied,* 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998), for the proposition that in order to preserve a complaint that expert evidence is unreliable and therefore no evidence, a party must object to the evidence before trial or when the evidence is offered. Such a

statement was made by the *Maritime* court on the basis that, without a timely objection, the offering party was not given an opportunity to correct any defect in the testimony. *Id.* at 409. However, in *Maritime,* the reliability of scientific evidence presented by five experts was not objected to until after the jury verdict, and the court found that the complaint could not be initially made at that late time. *Id.* at 411.

As a prerequisite for presentation for review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion. Tex. R. App. P. 33.1(a)(1); Tex. R. Evid. 103. To be timely means that the objection must be made, if possible, before the evidence is admitted or, if not possible at that time, objection must be made as soon as the ground of objection becomes apparent. *Land v. State,* 890 S.W.2d 229, 234 (Tex.App.--Beaumont 1994, no pet.). Error is also waived when testimony to the same effect has been admitted without objection. *Ramirez v. H.E. Butt Grocery Co.,* 909 S.W.2d 62, 69 (Tex.App.--Waco 1995, writ denied).

Kerr-McGee argues that the unreliability of Riley's opinions was disclosed only after cross-examination. Therefore, its motion to strike was timely. Even so, Kerr-McGee still allowed the admission of Exhibit 21, which formed the substance of Riley's opinion with respect to the amount of damages, without objection. Kerr-McGee conceded in oral argument that it could have taken Riley on voir dire at the time Exhibit 21 was offered, as it did with respect to at least two other exhibits, to determine whether the exhibit was objectionable, but did not do so because that voir dire would have allegedly lasted a considerable amount of time. However, in *Welch v. State,* 993 S.W.2d 690, 694 (Tex.App.

6

--San Antonio 1999, no pet.), it was held that a statement of "no objection" at the time that DNA test results were offered into evidence waived the defendant's complaint that the DNA expert deviated from protocol and lacked the expertise to sponsor the evidence. *Id.* at 694.

Nevertheless, this was a non-jury trial in which the concerns of keeping inadmissible evidence outside the purview of the jury are not present. We also recognize that some cross-examination may have been required before objections to the unreliability of Riley's opinions became apparent. Furthermore, Kerr-McGee moved to strike the testimony at the end of its cross-examination of Riley and at each appropriate opportunity thereafter. Therefore, we do not believe that Kerr-McGee waived its objection in this instance.

We must therefore consider whether Riley's testimony as to damages was based on a reliable factual foundation. Although Kerr-McGee does not challenge Riley's credentials, we note that he had a degree in petroleum engineering from the University of Texas and had worked as a petroleum engineer and reservoir engineer for Tenneco Oil Company and Cotton Petroleum. He had also been exploration manager for Natural Gas Anadarko and Courson Oil and Gas in Perryton, Texas. During that time, approximately 75% of his work was in the Texas Panhandle and approximately 99% was in the Anadarko Basin.

Riley testified that there were approximately 20.25 billion cubic feet of gas contained in the reservoir being produced by the Holmes 17-1 well. That figure was based on production from the well from January 1, 1994, through October 1994, as well as the

bottom hole pressure readings from the well and use of the Z factor to correct for deviation from the ideal gas. Riley estimated that 17 billion cubic feet of gas were recoverable, but only 14 billion cubic feet were still recoverable as of February 1, 1995. He prepared Exhibit 21, which was an analysis of the royalty cash flow from the hypothetical protection well producing by February 1, 1995. The gas prices were obtained from the comptroller's office as the prices for gas sold from the Holmes 17-1 well and the Fleetwood Trust 16-1 well, and the royalty interest was based on the interest in the oil and gas leases. The volumes of gas were derived from a production forecast made by Riley using the rate of production from the Holmes well and the production from other wells in the immediate area.

Later, Riley was recalled to testify as to the amount of gas drained from the Lower Puryear formation under Section 10. He estimated that, as of the beginning of 2001, approximately 3.1 billion cubic feet of gas had been drained. The amount drained by the end of October 1996 was 1.3 billion cubic feet, and the amount drained by January 1, 1999, was 2.6 billion cubic feet. Those figures would have included drainage that occurred prior to February 1, 1995, the date by which plaintiffs claimed an offset well should have been producing. Riley made those calculations by looking at the cumulative production from the field at a particular period of time and obtaining a bottom hole pressure over Z factor and comparing that to the original bottom hole pressure over Z factor to determine the percentage of gas depleted. He admitted that he had done no calculation as to how much gas the Holmes 17-1 well alone had drained as opposed to drainage also caused by the Fleetwood well.

8

Kerr-McGee relies on the following testimony to support its proposition that there is no reliable factual foundation for Riley's opinions as to the amount of damages:

\* \* \*

Q. (By Mr. Morris)  Now then, I am searching for any provable fact, a fact as to which you have proof upon which you can base your opinion as to the productivity of the hypothetical well.

A.  I do not know the productivity of the hypothetical well.

Q.  But that's what you based your entire damage calculations on in this case, is that that well would have produced 6.1 BCF of gas had it been drilled and commenced production as of February 1, 1995, isn't it?

A.  Yes, I did.

Q.  And you have absolutely no factual data upon which to support that opinion, do you Mr. Riley?

A.  There are – the only fact I have to base that on is what the wells in the immediate area are producing.

Q.  Okay.  And that does not tell you what the hypothetical well would have produced, does it?

A.  No, it does not.

Q.  All right. So back to my statement a moment ago, and to be completely honest, and I think you are, that you simply do not have any factual basis for projecting the production of that hypothetical well, do you?

A.  That is correct.

Q.  Okay.  It's purely unsupported assumption, or estimation, isn't it?

A.  No.

As already noted, Exhibit 21 was admitted without objection. Prior to its admission, Riley testified that he employed engineering principles in projecting the income from the protection well and that the figures on the exhibit had a sound basis in engineering principles. Exhibit 16 was also admitted without objection. It was a production forecast for the protection well and was the basis for the calculations in Exhibit 21. It showed the hypothetical well going on production in February 1995, at a rate of approximately 8 million cubic feet of gas a day, which was the rate at which the Holmes well was producing at that time. The rate of production declined to 4 million cubic feet of gas a day in February 1997, at which time the Fleetwood well went on production. Riley used the production and pressure of the neighboring wells to make his calculations as to the production of the hypothetical well. He testified that the amount of gas or the pressure that has been drawn down in the average reservoir at any point in time can be determined by looking at the cumulative production from the field at that time and comparing the bottom hole pressure over Z factor and comparing it to the original bottom hole pressure over Z factor.

In *Southeastern Pipe Line Co. v. Tichacek,* 977 S.W.2d 393, 399-400 (Tex.App.--Corpus Christi 1998), *rev'd on other grounds,* 997 S.W.2d 166 (Tex. 1999), there was testimony as to the probable returns of the hypothetical offset wells, which must have necessarily included an opinion as to production from those wells, that was sufficient to support the measure of damages found by the jury. *Id.* at 399-400. Thus, while Riley's opinion may not be absolute, we believe there is some factual basis to support his opinion

10

as to the amount of damages. The determination as to the credibility of that opinion is to be made by the trier of fact. Kerr-McGee's first issue is overruled.

In its second issue, Kerr-McGee complains that the trial court erred in denying its motions for judgment and to reform the judgment because there is no competent evidence to support an award of damages or to support the award made by the court. Although Kerr-McGee still complains that Riley's testimony is incompetent, which we have addressed under Kerr-McGee's first issue, Kerr-McGee also argues that even if the testimony as to damages is competent, there is no evidence to support the court's findings of damage. The trial court found damages in the amount of $840,910.51 measured by the royalties appellees would have received from a timely-drilled protection well for the period beginning February 1, 1995, and ending March 16, 2001. The court further found damages in the amount of $22,738.85 measured by the royalties appellees would have recovered from a timely-drilled protection well for the period beginning March 17, 2001, through the time of depletion of all recoverable reserves.

While appellees argue that the correct measure of damages is the royalties on the amount of gas drained from Section 10 as opposed to the royalties on the amount of gas a protection well would have produced, they do not specifically claim it as an issue in their appeal. Instead, they argue there is no evidence under either measure of damages to support an award with reasonable certainty. Because Kerr-McGee did not specifically assign as error the measure of damages used by the trial court, we lack the authority to pass on the propriety of the same. *Elliff v. Texon Drilling Co.,* 146 Tex. 575, 210 S.W.2d

11

558, 560 (1948). Moreover, while there may be some conflict as to the proper measure of damages, there is authority in Texas to support the measure of damages used by the trial court. *See Tichacek*, 977 S.W.2d at 399-400; *Shell Oil Co. v. Stansbury*, 401 S.W.2d 623, 628-29 (Tex.Civ.App.--Beaumont 1966, writ ref'd n.r.e.).

In determining a "no evidence" or legal sufficiency challenge, we examine the record for any probative evidence which, when viewed in its most favorable light, supports the judgment, and we disregard all contrary evidence. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex. 1965). If damages can be estimated with reasonable certainty, the amount is left to the trier of fact. *Bildon Farms, Inc. v. Ward County Water Imp. Dist. No. 2,* 415 S.W.2d 890, 896-97 (Tex. 1967); *Guardian Trust Co. v. Brothers*, 59 S.W.2d 343, 346 (Tex.Civ.App.--Eastland 1933, writ ref'd). However, the factfinder may not assess an amount neither authorized nor supported by evidence, and there must be a rational basis for the calculation. *First State Bank v. Keilman*, 851 S.W.2d 914, 930 (Tex.App.--Austin 1993, writ denied).

In this instance, the only evidence presented by appellees in support of the amount of damages came from Riley. We have already discussed that testimony in some detail and will not do so again.

Kerr-McGee also presented Ronald Platt, a consulting petroleum engineer who had previously worked for Chevron Oil Company, who prepared an exhibit which showed that the royalty value of the recoverable gas in place in the Lower Puryear reservoir in Section

12

10 was $120,000 based on .4 billion cubic feet of gas originally in place and an assumed 80% recovery factor. The amount of gas originally in place was based on an isopach map prepared by an employee of Kerr-McGee, who was a managing geologist.

The trial court stated in its findings of fact and conclusions of law that the award of damages was based on what the hypothetical well would have produced. Exhibit 21 detailed by month the net royalty income and cumulative income from February 1995, through December 2004 that the hypothetical well would have produced. However, the amount of $840,910.51 awarded by the trial court for the period from February 1, 1995 through March 16, 2001, does not appear anywhere on that exhibit. The closest amount is $849,775, which was the cumulative royalty income through May 1996. Neither side has offered an explanation as to how the trial court arrived at its award.

Appellees argue that because the damages awarded by the trial court fall within the range of Riley's damage calculations, the trial court's award is supported by the evidence. In advancing that position, they rely on *Howell Crude Oil Co. v. Donna Refining Partners*, *Ltd.,* 928 S.W.2d 100 (Tex.App.--Houston [14th Dist.] 1996, writ denied). In *Donna,* the only evidence in support of lost profits came from one expert, who presented a calculation of a refinery's total net income of $300,000 for a six-month period. Instead, the jury awarded an amount of $174,110. *Id.* at 107. The court concluded that while it was not clear how the jury arrived at the figure awarded, a trier of fact has the discretion to award damages within the range of evidence presented at trial. *Id.* at 108. Given various flaws in the

calculations as pointed out by the defendant, the jury could have concluded that a lesser amount was appropriate. *Id.*

In response, Kerr-McGee, while recognizing the *Donna* opinion, contends that the factfinder cannot arbitrarily pull a number out of a hat, *i.e.,* there must be a rational basis for the calculation and relies on *Keilman.* In that case, the jury found that First State Bank charged $360 in unauthorized interest in a demand letter. *Keilman,* 851 S.W.2d at 929. The Keilmans presented evidence at trial that $7,161.44 was excess interest charged, while First State Bank presented evidence that $169.92 was demanded in interest. Neither party could explain how the jury arrived at its decision. Therefore, the court determined that the jury's finding was inexplicable in light of the evidence presented at trial, and that no rational basis existed for the jury's calculation except that it fell between the Keilmans' figure and First State Bank's figure. *Id.* at 931. Since the evidence provided a relatively precise method for calculating the interest, the evidence presented was insufficient to support the jury's finding. *Id.*

The factfinder does not have to unquestioningly accept the testimony of an expert, but may reduce the amount of damages based on challenges to the expert's opinion. *See America's Favorite Chicken Co. v. Samaras*, 929 S.W.2d 617, 629 (Tex.App.--San Antonio 1996, writ denied). The factfinder also may consider conflicting expert testimony and blend the testimony to arrive at a verdict. *Knox v. Taylor*, 992 S.W.2d 40, 62 (Tex.App.--Houston [14th Dist.] 1999, no pet.); *Lindgren v. Delta Investments.,* 936 S.W.2d 422, 425 (Tex.App.-- Austin 1996, writ denied).

14

In this instance, there was evidence that it may not have been reasonable to assume, as did Riley, that a hypothetical offset well would have produced at the same rate as the Holmes 17-1 well and later at the same rate as the Fleetwood 16-1 well, which began production in 1997 from the same reservoir. Riley conceded that the Holmes and Fleetwood wells had different thicknesses and actually produced at different rates. The Fleetwood well actually produced at a much higher rate than the Holmes well. Further, there was evidence that Riley did not use the production figures of the Holmes well as those of the hypothetical well in the preparation of Exhibit 21. Therefore, the trial court could have reasonably concluded that some lesser amount of production would have occurred from a hypothetical well than that presented by appellees. The award of damages was within the range presented by the experts and is sufficient to uphold the award. Kerr-McGee's second issue is overruled.

In its third issue, Kerr-McGee complains that there is no evidence and no findings to support the award of prejudgment interest in the amount of $190,068.75 on the damages award of $840,910.51. Kerr-McGee concedes that normally in a breach of contract suit, the plaintiff is entitled to prejudgment interest from the date suit was filed if no notice was given prior to filing suit as in this instance. *See Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 530-31 (Tex. 1998). However, Kerr-McGee asserts three reasons why the same rule should not apply in this case: 1) *Johnson & Higgins* involved a single breach of contract and one amount of damages which accrued long before the lawsuit was filed; 2) damages resulting from drainage accrue on a month-

to-month basis, and they had not all accrued before suit was filed; and 3) the court did not specify an amount of damages that had accrued as of January 8, 1999, the date suit was filed, or make any findings of monthly accruals. Thus, Kerr-McGee posits, there is clearly no basis for calculating prejudgment interest.

In *Johnson & Higgins*, the court found that prejudgment interest on a breach of contract claim falls under the common law, but that common law prejudgment interest shall begin to accrue on the earlier of 180 days after the date a defendant receives written notice of a claim or the date suit is filed in accordance with the provisions of article 5069-1.05 § 6(a) of the Texas Revised Civil Statutes, which applies to wrongful death, personal injury, and property damage cases. *Id.* at 530-31. Thus, common law and statutory prejudgment interest were made consistent with one another.

Kerr-McGee cites *Black Lake Pipe Line Co. v. Union Const. Co., Inc.,* 538 S.W.2d 80, 95 (Tex. 1976) and *Phillips Petroleum Co. v. Stahl Petroleum Co.*, 569 S.W.2d 480, 488 (Tex. 1978), for the proposition that prejudgment interest may only be awarded where damages are established as of a definite time and the amount is definitely determinable. In *Union,* the recovery sought was the costs of extra work performed under a construction contract, which were due and owing as of the date of acceptance of the work. Therefore, the court was not required to address the issue raised by Kerr-McGee in this appeal as to damages that will accrue in the future. Similarly, in *Stahl,* the sums owed to Stahl Petroleum Company were monthly payments for the purchase of gas under a gas purchase contract which Phillips Petroleum Company had held and used without consent

16

pending Federal Power Commission approval of interstate gas prices. Thus, all of the sums owed had accrued by the date suit was brought and the question before us was once again not at issue.

Although *Johnson & Higgins* may have involved one amount of damages that accrued before suit was filed, it was noted that the scope of recoverable interest may include future damages awarded as part of the judgment. *Johnson & Higgins*, 962 S.W.2d at 530. Furthermore, prejudgment interest on damages for drainage was approved by the court in *Tichacek*, 977 S.W.2d at 401-02. Therefore, we see no reason why appellees are not entitled to recovery in this instance.

Nevertheless, Kerr-McGee argues that there is no evidence to support an award of prejudgment interest because the court made no findings as to the amount of damages as of January 8, 1999. The trial court's findings of fact show that the court calculated prejudgment interest on $840,910.51 from January 8, 1999, the day suit was filed. Thus, the court's judgment was in accordance with the law, and it was not necessary for the court to make a specific finding as to how much in damages had occurred as of the date suit was filed. Kerr-McGee's third issue is overruled.

In summary, all of the issues are overruled, and the judgment of the trial court is affirmed.


John T. Boyd
Publish.                                                    Chief Justice

17