**NATIONAL FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, Appellant,**

v.

**VALERO ENERGY CORPORATION and Saber Energy, Inc., Appellees.**

No. 13–88–217–CV.

Court of Appeals of Texas, Corpus Christi.

Aug. 31, 1989.

Rehearings Denied Oct. 5, 1989.

B. Mills Latham, Latham & Moss, Corpus Christi, W. James Kronzer, Houston, Michael R. Knox, Knox, Beadles & Johnston, R.B. Cousins, Thompson, Coe, Cousins & Irons, Dallas, for appellant.

Van Huseman, Bryan Powers, Paul Dodson, White, Huseman, Pletcher & Powers, Corpus Christi, William W. Kilgarlin, Powell, Popp & Ikard, Austin, for appellees.

Before BENAVIDES, UTTER and DORSEY, JJ.

## OPINION

BENAVIDES, Justice.

Valero Energy Corporation and Saber Energy, Inc. (Valero), sued National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union), for failing to provide coverage under an insurance policy National Union issued to Valero insuring against property damage during a refinery expansion project. Valero sought to recover compensatory damages under the policy and exemplary damages for National Union's alleged breach of its duty of good faith and fair dealing, claiming that National Union demonstrated a conscious indifference to Valero's rights in denying liability. The case was tried to a jury, which found a covered and payable loss of $10,000,000, found that National Union denied Valero's claim without reasonable basis, and assessed exemplary damages at $15,000,000. Based on the jury's answers, judgment was rendered for Valero for $27,965,291.79, plus post-judgment interest and costs of court. National Union appeals by nineteen points of error.

The insurance agreement, known as an all-risk or builder's risk policy, insured generally, subject to certain named exclusions, against all occurrences causing physical loss or damage to property used in the expansion project during the expected construction period from December 15, 1981 to July 1, 1983, including any resulting loss of gross earnings.

The facts at trial were essentially undisputed. The expansion project added a Heavy Oil Cracker (HOC) to Valero's refinery in order to process high sulfur content crude oil. The project included the construction of several different processing units, including: the desalter; the hydrodesulfurization reactor unit; the dimersol unit; the alkylation unit; the heavy oil cracker itself; the citrate scrubber; the power recovery unit; and the expander. For purposes of the present case, the only unit and process of any significance is the

citrate scrubber. Flue gas, a product of the refining process, passes into the citrate scrubber through a steel transition piece. Once in the citrate scrubber, the gas is sprayed with a mist which causes a portion of the gas to form acid. Panels of material called "demisters" create several chambers within the citrate scrubber to separate the liquid from the gas which is then discharged through the smokestack.

When Valero first attempted to put the citrate scrubber into operation during the testing phase of the project in the summer of 1983, it sustained substantial damages as a result of faulty design. The designing engineers failed to anticipate the environment and forces to which the components of the citrate scrubber would be exposed, used inadequate materials, and failed to properly channel the flue gas as it passed through the citrate scrubber. These design errors caused corrosion to occur when the improper flow allowed acid to back up into the transition piece, which was itself made of inadequate carbon steel. The corrosion left holes in the transition piece that allowed the flue gas and acid to escape. The faulty design also caused corrosion and physical damage to the demisters, which could not stand the force of the flow because they were made of inadequate plastic material, pieces of which broke off and blew out the smokestack. As a consequence of these defects and the resulting damage, Valero had to shut down the refinery several times between June 1983 and May 1984, in order to make repairs and alterations, and to replace the carbon steel transition piece and plastic demisters with an A20 steel transition piece and stainless steel demisters, which were substantial enough to withstand the environment within the unit.

National Union's first five points of error complain of no evidence and improper submission to the jury of questions concerning Valero's right to recover for the loss.

By its fourth point of error, National Union complains specifically that there was no evidence in the record that the loss inquired about did not come within the exclusionary provisions 6(h) and 6(j) of the policy.

■ When the insurance company denies coverage based on an exclusion in the policy, it becomes the insured's burden to show that the exclusion does not apply. *Travelers Indemnity Co. v. McKillip,* 469 S.W.2d 160, 163 (Tex.1971); *Sherman v. Provident American Insurance Co.,* 421 S.W.2d 652, 654 (Tex.1967); *Brooks v. Blue Ridge Insurance Co.,* 677 S.W.2d 646, 651 (Tex.App. —Amarillo 1984, writ ref'd n.r.e.).

In the present case, National Union denied coverage based on the following exclusions in Clause 6 of the policy:

(h) loss or damage caused by rust, corrosion, frost or freezing unless resulting from a peril insured against; ...

(j) cost of making good faulty workmanship, materials, construction or design, but this exclusion shall not be deemed to exclude physical loss or damage arising as a consequence of faulty workmanship, material, construction or design; ....

■ National Union contends that under 6(h) all the damages occurring to the citrate scrubber were excluded from coverage as having been caused by rust or corrosion of the transition piece and demisters. The evidence is clear that corrosion was the immediate cause of damages to the unit, but that the corrosion itself was the result of faulty design. Generally, if loss occurs as a result of two concurring perils, one insured and one not, then the loss is covered only to the extent it can be traced to the covered peril. *McKillip,* 469 S.W.2d at 162; *Auten v. Employers National Insurance Co.,* 722 S.W.2d 468, 470 (Tex.App.— Dallas 1986, writ denied); *Cox v. Queen Insurance Co. of America,* 370 S.W.2d 206 (Tex.Civ.App.—San Antonio 1963, writ ref'd n.r.e.). In *Auten,* for instance, where an all-risks homeowner's policy contained a simple blanket exclusion for losses due to contamination, the court refused to trace the chain of causation back to third-party negligence as a non-excluded origin. *Auten,* 722 S.W.2d at 471.

However, there is coverage when the exclusion is qualified by the terms of the policy to allow recovery where the otherwise excluded peril is itself caused by a covered peril. *Adrian Associates, General Contractors v. National Surety Corp.*, 638 S.W.2d 138, 141 (Tex.App.—Dallas 1982, writ ref'd n.r.e.); *see also Allstate Insurance Co. v. Smith*, 450 S.W.2d 957 (Tex.Civ.App.—Waco 1970, no writ); *Employers Casualty Co. v. Holm*, 393 S.W.2d 363, 366 (Tex.Civ.App.—Houston 1965, no writ). In *Adrian* the policy excluded losses due to settling of the foundation, unless resulting from a peril not excluded. Due to the rupture of an underground water main, water accumulated under the insured's foundation and caused a void between the slab and the soil, which in turn caused the foundation to settle. The Court held that damages due to the settling were nevertheless covered as resulting from a peril not excluded under the policy. *Adrian*, 638 S.W.2d at 141.

In the present case, the exclusion for rust damage was qualified by an exception for damage resulting from a peril insured against. The evidence is uncontroverted that sudden and unexpected corrosion occurred as a result of a faulty design, rather than by the gradual natural deterioration causing ordinary rust. Since faulty design is a peril insured against under the policy, the corrosion damage involved here falls within the coverage of the policy. Therefore, to the extent that losses resulting from faulty design are covered by the policy and not excluded under 6(j), they are covered under the exception to the 6(h) rust exclusion.

The question remains whether clause 6(j) excluded from coverage the cost associated with the repair and replacement of the defective and damaged components of the unit. Clause 6(j) provides that the cost of "making good" faulty design is excluded, but further provides an exception to the exclusion for physical damages "arising as a consequence of" faulty design. The loss in the present case can be characterized in either or both ways: the use of an inadequate transition piece and demisters required Valero to replace them in order to "make good" the faulty design; however, as a consequence of the faulty design and the inadequacy of the components there was also physical damage to the transition piece and demisters which necessitated their replacement.

The court must adopt the construction of an exclusionary clause which favors the insured as long as that construction is not unreasonable. *Blaylock v. American Guarantee Bank Liability Insurance Co.*, 632 S.W.2d 719, 721 (Tex.1982); *Glover v. National Insurance Underwriters*, 545 S.W.2d 755, 761 (Tex.1977). In the present case then, characterizing the loss sustained as a consequence of the faulty design brings it within the exception to the exclusion and thus within the coverage of the policy. Appellant's fourth point of error is overruled.

By its first point of error, National Union complains that the trial court erred in submitting Special Issue 1 to the jury for the reason that it constitutes an improper submission of a question of law. Special Issue 1 asked the jury: "Did a loss occur which was covered and payable under the policy?" The jury answered affirmatively. Special Issue 2 asked the jury: "What was the amount of such loss, if any, payable under the policy?" The jury answered $10,000,000. National Union contends generally that the broad form of submission of the question of coverage in Special Issue 1 asked the jury for a legal conclusion whether the loss was covered under the policy and, therefore, must be disregarded. National Union argues that, to inquire by special issue whether some conduct or circumstances fall "under the terms of the [insurance] contract" has the effect of improperly asking the jury a question of law about the construction of the contract. *See Hervey v. Passero*, 648 S.W.2d 344, 349 (Tex. App.—El Paso 1983), *rev'd on other grounds*, 658 S.W.2d 148 (Tex.1983); *Wirtz v. Orr*, 533 S.W.2d 468, 471 (Tex.Civ.App.—Eastland 1976, writ ref'd n.r.e.).

However, in *Island Recreational Development Corp. v. Republic of Texas Savings Association*, 710 S.W.2d 551 (Tex.

1986), a case where plaintiffs complained of breach of a loan commitment by a bank involving waiver and estoppel of the commitment period, the trial court submitted a broad issue to the jury asking whether they found that "plaintiffs performed their obligations under the commitment letter in question." The Texas Supreme Court held that trial courts are permitted, and even urged, to submit the controlling issues of a case in broad terms so as to simplify the jury's chore. *Id.* at 555; *see also Glendon Investments, Inc. v. Brooks,* 748 S.W.2d 465, 469 (Tex.App.—Houston [1st Dist.] 1988, writ denied); *American Cyanamid Co. v. Frankson,* 732 S.W.2d 648, 658 (Tex. App.—Corpus Christi 1987, writ ref'd n.r. e.). In addition, Texas Rule of Civil Procedure 277, governing submission to the jury, was amended in 1987 to provide that the trial court shall, "whenever feasible, submit the cause upon broad-form questions." Tex.R.Civ.P. 277.

■ The *Island* Court further held, and Rule 277 provides, that the trial court should submit appropriate accompanying instructions to enable the jury to render a verdict. *Island,* 710 S.W.2d at 555. An instruction is proper if it finds support in any evidence and the inferences to be drawn therefrom, and if it might be of some aid or assistance to the jury in answering the issues submitted. *Bissett v. Texas Employers Insurance Association,* 704 S.W.2d 335, 337 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). In the present case, for instance, it would have been proper for the court to submit instructions to the jury explaining the conditions under which the exclusions and exceptions to the exclusions would affect coverage under the policy.

National Union failed to request such an instruction to accompany the broad-form submission of Special Issue 1. It did request instructions to accompany one of its own tendered issues, as follows:

Special Issue No. 4A

Do you find from a preponderance of the evidence that physical loss or damage to the property described below was payable under the policy of insurance

marked Exhibit _____? [Transition piece, Munsters demisters, 316L Chevrons, Pall ring basket, A20 transition piece and chevrons, and Peerless demisters were listed individually with a space beside each for the jury to answer either "we do," or "we do not."]

In order to answer these issues "We do," you must find from a preponderance of the evidence that the physical loss or damage was not the cost of making good faulty workmanship, materials, construction, or design. The cost of making good faulty workmanship, materials, construction, or design is the cost represented in correcting or modifying faulty workmanship, materials, construction, or design. Damage which is the cost of making good is not payable.

On the other hand, if you find by a preponderance of the evidence that such damage was a consequence of faulty workmanship, materials, construction, or design and not the cost of correcting or modifying the faulty workmanship, materials, construction, or design, the loss is payable.

You are also instructed that the loss to the transition piece is not payable if it was caused by corrosion from its own design or material.

However, the instruction as submitted incorrectly instructed the jury to deny coverage if it found that damage to the transition piece resulted from corrosion, and did not explain the exception to that exclusion where the corrosion damages are caused by a peril insured against.

■ Failure to submit a definition or explanatory instruction is not grounds for reversal unless a substantially correct instruction has been requested in writing and tendered by the party complaining of the judgment. *Donnelley Marketing v. Lionel Sosa, Inc.,* 716 S.W.2d 598, 602 (Tex.App.— Corpus Christi 1986, no writ); *Ryan Mortgage Investors v. Fleming–Wood,* 650 S.W.2d 928, 933 (Tex.App.—Fort Worth 1983, writ ref'd n.r.e.); Tex.R.Civ.P. 278. When a party does not submit to the trial court requested definitions and instructions in substantially correct form, he waives

any error. *Heller v. Armstrong World Industries, Inc.*, 708 S.W.2d 18, 20 (Tex. App.—Dallas 1986, writ ref'd n.r.e.); *Sisco v. Hereford*, 694 S.W.2d 3, 9 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.). National Union cannot now complain that Special Issue 1 or the charge in general was inadequate because the trial court failed to submit a correct instruction. Appellant's first point of error is overruled.

By its second, third and fifth points of error, appellant complains that the trial court erred in overruling its motions for judgment non obstante veredicto and to disregard the jury's answers to Special Issue 1, because appellee failed to meet its burden to request findings on all material issues essential to its ground of recovery and the answer to Special Issue Number 1 cannot support the judgment. We have already indicated that Special Issue 1 was properly submitted in broad form. There is no abuse of discretion in submitting a broad issue which embodies the narrower controlling issues or elements. *Coronado Transmission Co. v. O'Shea*, 703 S.W.2d 731, 735 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.); *Line Enterprises, Inc. v. Hooks & Matteson Enterprise, Inc.*, 659 S.W.2d 113, 117 (Tex.App.—Amarillo 1983, no writ). All elements of Valero's claim for coverage under the policy were contained within Special Issues 1 and 2 and appellee secured findings sufficient to establish its ground of recovery. Appellant's second, third and fifth points of error are overruled.

By its sixth, seventh and eighth points of error, National Union complains that the trial court erred in submitting Special Issue 2 because it failed to inquire about, or instruct the jury concerning, the contractual measure of damages required by the policy, and that the trial court should have ignored the jury's answer to Special Issue 2, which asked merely, "What was the amount of such loss, if any, payable under the policy?"

It was not error for the trial court to submit by Special Issue 2 the question of compensatory damages in one broad-form issue. *Island*, 710 S.W.2d 555; Tex.R. Civ.P. 277. As with Special Issue 1, the trial court also should have given instructions explaining the correct formula for calculating damages under the policy. *Id.* However, National Union failed to request such instructions in the proper form to accompany the broad-form submission of Special Issue 2 and guide the jury in its consideration of damages. National Union did tender its own jury questions 5–10, covering business interruption losses, which contained both in the issues and in accompanying instructions the policy formula for calculating actual loss of gross earnings. However, the instructions were not in a form that could simply be carried over to the broad-form question submitted.

The same reasoning we applied in our disposition of point of error one applies here. In order to complain of the trial court's failure to submit an explanatory instruction, appellant must have requested a substantially correct instruction. *Donnelley*, 716 S.W.2d at 602; *Ryan*, 650 S.W.2d at 933; Tex.R.Civ.P. 278. Where the trial court has failed to include instructions on the proper measure of damages, it is the complaining party's burden both to object to the charge and to tender such instructions in substantially correct form. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 538 n. 4 (Tex.1981); *Texas Cookie Co. v. Hendricks & Peralta, Inc.*, 747 S.W.2d 873, 878 (Tex.App.—Corpus Christi 1988, writ denied). The court should not be required to pick through appellant's own tendered issues to construct an instruction to conform to an issue actually submitted; this is the responsibility of the party complaining that a necessary instruction is missing from the court's charge. Appellant's sixth, seventh and eighth·points of error are overruled.

By its ninth through twelfth points of error, National Union challenges the legal sufficiency of the evidence to show business interruption loss, property loss, or reasonable and necessary costs of repairs.

Specifically, by its ninth point of error, appellant complains that the trial court erred in entering judgment for appel-

lee because it presented no evidence of business interruption damages in conformity with the contract formula. In considering a "no evidence", "insufficient evidence" or "against the great weight and preponderance of the evidence" point of error, we will follow the well-established test set forth in *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986); *Dyson v. Olin Corp.*, 692 S.W.2d 456 (Tex.1985); *Glover v. Texas General Indemnity Co.*, 619 S.W.2d 400 (Tex.1981); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *Allied Finance Co. v. Garza*, 626 S.W.2d 120 (Tex.App.— Corpus Christi 1981, writ ref'd n.r.e.); and Calvert, *No Evidence and Insufficient Evidence Points of Error*, 38 Texas L.Rev. 361 (1960). The present policy provides under Paragraph 2 of the Business Interruption Endorsement that:

In the event of such loss, damage or destruction, the Company shall be liable for the ACTUAL LOSS OF GROSS EARNINGS sustained by the Assured *resulting from the delayed completion of the subject project*, but not exceeding the reduction in Gross Earnings less charges and expenses which do not necessarily continue during the period required to repair or replace such lost, damaged or destroyed property, commencing with the date when the "Initial Date of Plant Operations" of the subject project would have been attained had the loss, damage or destruction not occurred and ending with the date when the "Initial Date of Plant Operations" of the subject project is actually attained, without regard to expiration of this policy.

Paragraph 3(d) further provides that:

The "Initial Date of Plant Operations" shall be that date following completion of construction on which raw materials are introduced into the process system with the anticipation that a marketable finished product will result.

Appellant contends that there was no evidence of a compensable delay in the initial date of plant operations. Specifically, appellant asserts that the evidence conclusively shows that construction was completed and raw materials were introduced into the process system in June 1983, rather than June 1984. National Union relies on the testimony of Charles LeRoy, a chemical engineer and former operations manager at Valero, who testified that construction of the expansion project had been completed and raw materials were introduced into the process in June 1983.

Valero, however, introduced into evidence a document labelled the Independent Engineer's Phase I Completion Certificate, which had been prepared pursuant to an agreement between Valero and the banks financing its project. The certificate recites that as of June 6, 1984, the project had been constructed and was operational. According to the testimony of Gary Spangler, raw materials were introduced into the process in July 1983, but construction was not completed until June of 1984, when the engineer signed the certificate. John Cotterell, former manager of engineering and plant maintenance for Valero, also testified that he believed it was reasonably correct to say that on or about June 6, 1984, construction was substantially complete. Finally, Gordon Refoy, an insurance adjuster specializing in oil and chemical refining losses, testified that a certificate of completion determines when construction is complete.

The controversy centers around whether construction was complete under the terms of the policy at the time construction under the faulty design was finished in 1983, or at the time the plant was completed under the corrected design and was actually ready to begin continuing operations in 1984. We find that Valero has presented some evidence that construction was not completed under the terms of the policy until the time the certificate was signed on June 6, 1984, and that this would mark the initial date of plant operations.

National Union further contends that three of the six down periods for which Valero claimed business interruption damages were due to perils unrelated to the present claim. Even assuming that National Union is correct or that there is no evidence to link these three down periods with an insured peril, the other three peri-

ods which National Union fails to challenge are some evidence to support Valero's claim for business interruption loss.

Finally, National Union asserts that Valero's evidence failed to show damages in accordance with the measure provided under clauses 3(a) and 3(c), which state that:

(a) The measure of recovery of Reduction in Gross Earnings (less charges and expenses which do not necessarily continue) shall be based upon the gross earnings for the first twelve (12) months operations after the "Initial Date of Plant Operations" as defined below....

(c) In no event shall recovery hereunder exceed the actual loss sustained by the Assured.

Specifically, National Union contends that Roger Burton, a CPA who calculated Valero's losses and testified to its business interruption damages at trial, did not apply this standard. Burton admitted that he did not calculate the loss based on the clause 3(a) formula, because he assumed based on the figure Valero gave him that the clause 3(a) formula would be higher than the actual loss sustained. Burton testified as follows:

Q: I want you to assume that the uncontroverted testimony in this case is that the initial date of plant operations actually attained was about June 8th of 1984?

A: Okay.

Q: Okay. And I want you to assume further and I think you were given this [clause 3(a)] figure as part of your underlying data that the figure would have been $81 million by this measure?

A: Yes, sir.

Q: And is this [other] amount that you have calculated a lesser amount?

A: Considerably.

The other amount Burton calculated was based upon actual prices during the down periods and processing projections in Valero's monthly operating plan to supposedly more accurately calculate the loss at $15,900,000. Aside from Burton's mere assumption, however, Valero presented no evidence that clause 3(a) formula damages would be any higher than the damages

calculated by Burton. Valero thus presented no evidence of business interruption damages in conformity with clauses 3(a) and 3(c) of the insurance contract. On this basis, appellant's ninth point of error is sustained.

We need not address appellant's twelfth point of error, which further complains that any evidence that Valero did present to show lost profits as a result of the business interruption was speculative, and for that reason also there was no evidence to support such damages.

By its tenth and eleventh points of error, National Union complains that there is no evidence to show the amount of property loss or that Valero's costs for repair and replacement were reasonable and necessary.

Burton testified to the amounts Valero spent to repair and replace the defective and damaged components of the citrate scrubber and identified a list summarizing the property damage, totaling $1,589,738, which Valero introduced into evidence. Clearly, Burton's testimony and the exhibit provided some evidence of the amount of the property loss occasioned by the peril. This was sufficient to show that Valero was entitled to recover that amount under the policy. *See Jones v. American Economy Insurance Co.*, 672 S.W.2d 879 (Tex. App.—Dallas 1984, no writ); *Imperial Insurance Co. v. National Homes Acceptance Co.*, 626 S.W.2d 327 (Tex.App.—Tyler 1981, writ ref'd n.r.e.). Appellant's tenth and eleventh points are overruled.

Appellant's thirteenth through sixteenth points of error complain of the award to Valero of exemplary damages. Specifically, by points of error thirteen and fourteen, National Union argues that the trial court erred in awarding Valero exemplary damages because there was no finding of actual damages in tort and National Union failed to obtain a finding of the type of conduct necessary for exemplary damages in a tort case.

The jury found that National Union had no reasonable basis for denying Valero's claim or National Union failed to determine

whether there was any reasonable basis for denying Valero's claim, which proximately caused Valero's damages. The jury also awarded Valero fifteen million dollars as exemplary damages.

In *Arnold v. National County Mutual Fire Insurance Co.*, 725 S.W.2d 165 (Tex.1987), the Supreme Court recognized that there is a duty of good faith and fair dealing on the part of insurers dealing with insureds. The cause of action was described by the court as:

> A cause of action for breach of good faith and fair dealing is stated when it is alleged that there is no reasonable basis for denial of a claim or delay in payment or a failure on the part of the insurer to determine whether there is a reasonable basis for the denial or delay.

*Arnold*, 725 S.W.2d at 167.

A reasonableness standard has been imposed by the Court which is akin to the reasonable, ordinary prudent person standard of a general negligence case. Exemplary damages and mental anguish damages are recoverable for a breach of good faith and fair dealing under the same principles allowing recovery under other tort actions. *Id.* at 168. The cases cited by the Supreme Court show that exemplary damages are allowed in those situations in which a defendant has displayed conduct which is willful, malicious or shows conscious indifference. The purpose or intention of the defendant is determinative of his liability for exemplary damages. *Bennett v. Howard*, 141 Tex. 101, 170 S.W.2d 709, 712 (1943). Exemplary damages are considered excess compensation in addition to actual damages sustained, as punishment for the gross negligence alleged as the basis of the suit. *Id.* at 713.

In *Chitsey v. National Lloyds Insurance Co.*, 738 S.W.2d 641 (Tex.1987), the Supreme Court reversed the jury's finding of exemplary damages because the jury failed to find that the insurance company was grossly negligent in handling the plaintiff's claim. A finding of "intentional" conduct has been held sufficient to uphold an exemplary damage finding. *Lee v. Safe-mate Life Insurance Co.*, 737 S.W.2d 84, 87 (Tex.App.—El Paso 1987, writ denied).

Here, the jury was not asked to make a finding of intentional misconduct by National Union. Appellant objected to the submission of the issue stating that the court had failed to submit an issue regarding gross negligence or willful, malicious acts to support the submission of an issue on exemplary damages. The jury found only that National acted unreasonably. This would have provided a basis for an actual damage recovery in tort, but does not support an exemplary damage finding. To hold otherwise, we would, in effect, be saying that a finding of a breach of the duty of good faith and fair dealing in itself is sufficient to provide a basis for exemplary damages. This would be contrary to the Supreme Court's holdings in both *Arnold* and *Chitsey*. We sustain appellant's thirteenth and fourteenth points of error and find that the trial court erred in awarding exemplary damages. Therefore, we need not address appellant's fifteenth and sixteenth points of error, which also complain of the award of exemplary damages.

By its seventeenth point of error, National Union complains that the trial court erred in entering a judgment which awarded prejudgment interest in excess of six percent. The final judgment awarded Valero $27,965,291.79. Presumably, this amount included the jury awards of $10,000,000 actual and $15,000,000 exemplary damages, plus $2,965,291.79 representing ten percent in prejudgment interest on the actual damages.

Both in a written Objection to Plaintiff's Form of Judgment and at a hearing on Valero's Motion for Judgment, National Union objected to the form of Valero's proposed judgment on the ground that it improperly calculated interest at ten rather than six percent. At a hearing on Valero's Motion for Judgment the court initially replied that it would leave interest at six percent, but then, in response to Valero's request, postponed judgment in order for the parties to further brief the issue. Afterwards, the trial court filed its written judgment allowing interest at ten percent.

We hold that National Union preserved error on this point by bringing the matter to the trial court's attention in its written and oral objections to the proposed judgment. *See Pierce v. Gillespie*, 761 S.W.2d 390, 397 (Tex.App.—Corpus Christi 1988, no writ) (on rehearing); *Larrumbide v. Doctors Health Facilities*, 734 S.W.2d 685, 693–94 (Tex.App.—Dallas 1987, writ denied); Tex.R.App.P. 52(a).

Prejudgment interest in Texas is calculated on accounts and contracts as follows:

When no specific rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable.

Tex.Rev.Civ.Stat.Ann. art. 5069–1.03 (Vernon 1987).

■ However, in *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 554 (Tex.1985), the Supreme Court of Texas held that, based on principles of equity, prejudgment interest on personal injury and wrongful death judgments shall accrue at the prevailing rate that exists on the date that judgment is rendered according to the provisions of Tex.Rev.Civ.Stat.Ann. art. 5069–1.05 § 2 (Vernon Supp.1989), which would be ten percent in the present case. In *Perry Roofing Co. v. Olcott*, 744 S.W.2d 929 (Tex.1988), the Court extended this measure of equitable prejudgment interest to all cases in which the amount of damages is not ascertainable from the face of a contract. When the relationship between the parties arose in contract, as here, the test for determining whether the interest provisions of Article 5069–1.03 or of *Cavnar* apply is whether the damages could be ascertained by reference to the contract. *See Rio Grande Land & Cattle Co. v. Light*, 758 S.W.2d 747 (Tex.1988).

■ An insurance policy is sufficient to constitute a contract ascertaining a sum payable within the meaning of Article 5069–1.03 if the policy provides the conditions upon which liability depends and fixes a measure by which the sum payable can be ascertained with reasonable certainty, in light of the attending circumstances. *Thompson v. Trinity Universal Insurance Co.*, 708 S.W.2d 45, 48 (Tex.App.—Tyler 1986, writ ref'd n.r.e.); *Commonwealth Lloyd's Insurance Co. v. Thomas*, 678 S.W.2d 278, 297 (Tex.App.—Fort Worth 1984, writ ref'd n.r.e.); *Miles v. Royal Indemnity Co.*, 589 S.W.2d 725, 736 (Tex.Civ. App.—Corpus Christi 1979, writ ref'd n.r. e.). Where the actual value of damaged property is ascertainable with reasonable certainty, an insurance contract covering that property and specifying the conditions upon which liability depends comes within the interest provisions of Article 5069–1.03. *Thompson*, 708 S.W.2d at 48; *Thomas*, 678 S.W.2d at 297; *Miles*, 589 S.W.2d at 736. Damages in the present case were ascertainable with reasonable certainty by reference to the insurance policy, and the trial court should have applied the interest provisions of Article 5069–1.03, providing six percent as the amount of prejudgment interest on Valero's recovery of actual damages. Appellant's seventeenth point of error is sustained.

■ By its eighteenth and nineteenth points of error, National Union complains that the trial court erred in failing to limit its liability to a 75% pro rata share of coverage, and by failing to admit evidence of other coverage to substantiate the pro rata reduction.

Appellant relies on *United States Fire Insurance Co. v. Stricklin*, 556 S.W.2d 575, 578 (Tex.App.—Dallas 1977), *writ ref'd n.r.e.*, 565 S.W.2d 43 (Tex.1978), where the Court, following the rule that if two or more insurers contract to pay a portion of a loss, each is liable only to the extent that the amount insured by that insurer bears to the total loss, *see Traders & General Insurance Co. v. Hicks Rubber Co.*, 140 Tex. 586, 169 S.W.2d 142, 148 (1943), held that it was error for the trial court to refuse to prorate a loss between insurers where the policy provided that, "[t]his company shall not be liable for a greater proportion of any loss than the amount hereby insured shall bear to the whole insurance covering the property

against the peril involved whether collectible or not."

In the present case, the pertinent clauses of the insurance policy provide as follows:

11. Limits of Liability

This company shall not be liable for more than *$75,000,000* each and every loss....

Pro Rata Endorsement

Limits of Liability

This Company's share of the limits of liability shall not exceed *seventy-five percent (75%)* of the limits of liability set forth in Clause 11 of this policy.

Read together, these clauses clearly indicate that the parties agreed to limit National Union's total liability to 75% of $75,000,000. Unlike the policy in *Hicks*, however, nothing in the present policy states that National Union would be liable for only a portion of any loss which is less than the above limits. Although it may have been National Union's intention to so limit its liability, the supposed intentions of a party cannot vary the clear language of the contract or add provisions to the contract that are clearly absent. If a contract is invested with a definite legal meaning, there is no necessity to speculate on the intention of the parties. *Anderson v. Jasper Federal Savings and Loan Association*, 738 S.W.2d 768, 770 (Tex.App.—Beaumont 1987, writ denied). Appellant's eighteenth and nineteenth points of error are overruled.

Because the actual damage award of $10,000,000 (which was not submitted in separate items of damages) cannot be supported without an inclusion of damages for business interruption loss, and since we have found no evidence of business interruption loss in conformity with the contract formula for calculating business loss, we reverse the judgment of the trial court and remand the entire case for a new trial.