**SOUTHEASTERN PIPE LINE COMPANY, INC., Trustee, et al., Appellants,**

v.

**Frances TICHACEK, et al., Appellees.**

**No. 13–96–196–CV.**

Court of Appeals of Texas, Corpus Christi.

June 11, 1998.

David Lindsay Monroe, Levert J. Able, Able & Monroe, P.C., William Pannill, Roy L. Barnes, Pannill, Moser & Barnes, Houston, Larry E. Wadler, Wharton, Rick Rogers, Charles W. Gordon, Porter, Rogers, Dahlman, Gordon & Lee, Corpus Christi, for Appellants.

William D. Wood, Jennifer L. Price, Peggy S. McClard, William J. Boyce, Fulbright & Jaworski, Houston, Vincent L. Marable, III, Paul Webb, Wharton, for Appellees.

Before SEERDEN, C.J., and HINOJOSA and CHAVEZ, JJ.

## OPINION

SEERDEN, Chief Justice.

This is an oil and gas case. Lessors[1] sued Southeastern Pipe Line Co., individually and as trustee for numerous non-operating working interest owners, for wrongfully allowing the drainage of gas reserves from under their lands to be produced on other leases under Southeastern's control. At trial, the jury found against Southeastern and the trial court granted judgment for actual damages caused to each of the Lessors by wrongful drainage. Southeastern raises nine points of error complaining of the sufficiency of the evidence to support the claim for wrongful drainage or resulting damages, and challenging awards of prejudgment interest and attorney's fees. The Lessors raise thirteen contingent cross-points, which we do not address because we conclude that the judgment in their favor should be affirmed.

In the late 1930's the East Bernard gas field was discovered. In the late 1950's, Stanley C. Woods began to lease mineral rights in the western part of the field, drilling numerous wells, some of which continue to produce gas. Woods eventually consolidated his leases under the name Southeastern Pipe Line Company, made up of Woods' own interests as well as those of other investors in the company. Over the past thirty years, Southeastern has produced some 30 billion cubic feet (b.c.f.) of gas from its wells in the East Bernard field, and its engineers estimate another 80 b.c.f. remain to be produced.

After the western boundary had been established, Woods sought to explore the eastern extent of the field on a lease taken on the W.C. Leveridge tract. Woods drilled a "wildcat" test well in 1990 designated the W.C. Leveridge Well No. 4, some distance from wells which were already producing in the field. Woods also sought to protect Southeastern's interest in the eastern portion

---

1. Frances and Victor Tichacek, Henry and Darlene Divin, Reed and Lou Ann Kubena, and John Rabius.

of the field by taking three-year leases in late 1990 and early 1991 on adjoining lands owned by the present Lessors to the north of the W.C Leveridge tract. As the East Bernard was a depletion-drive field, another lessee-operator to the north could have drilled wells to drain gas from under the W.C. Leveridge tract if Woods had not already leased those lands. When the W.C. Leveridge Well No. 4 began to produce significant quantities of gas, Woods then drilled two more successful wells on the W.C. Leveridge tract, designated the W.C. Leveridge Well No. 5 in 1992 and W.C. Leveridge Well No. 6 in 1993. However, he did not drill on the Lessors' tracts to the north, nor did he attempt to pool them with producing acreage until just before the three-year leases otherwise would have expired.

In December 1993, Woods pooled 175 acres of Lessors' lands with 175 acres of the W.C. Leveridge lands to share production from the W.C. Leveridge Well No. 5. By their own terms, the northern leases were thus extended by production on the pooled unit. The Lessors, however, complained that the pooling was done in bad faith and that their leases had expired. Southeastern then brought the present lawsuit as a declaratory judgment to declare the leases valid. Lessors counterclaimed against Southeastern for bad faith pooling and breach of its covenant to protect them from drainage by the W.C. Leveridge wells. They claimed that the pooling of their leases with the single No. 5 well came too late and provided them too little share in the production of the W.C. Leveridge wells as a whole, such that their leases were being unlawfully extended and their lands wrongfully drained. The jury rejected the Lessors' claims of bad faith pooling, but did find that they had been substantially drained. The trial court granted judgment for the Lessors for wrongful drainage.

By its first four points of error, Southeastern complains that the Lessors failed to prove that it wrongfully drained their lands.

■ An oil and gas lessee has an implied obligation to protect from local drainage or migration from under one lease to the well bore of a producing well on an adjacent lease. *Amoco Production Co. v. Alexander,*

622 S.W.2d 563, 567 (Tex.1981). The standard of care in testing the performance of this obligation is that of a reasonably prudent operator under the same or similar facts and circumstances, such that claimed violations by the lessee should be tested against the general duty to conduct operations as a reasonably prudent operator in order to carry out the purposes of the oil and gas lease. *Id.* at 567–68; *Parker v. TXO Production Corp.,* 716 S.W.2d 644, 646 (Tex.App.—Corpus Christi 1986, no writ).

■ Specifically, the duties of a reasonably prudent operator to protect from drainage may include (1) drilling replacement wells, (2) re-working existing wells, (3) drilling additional wells, (4) seeking field-wide regulatory action, (5) seeking Rule 37 exceptions from the Railroad Commission, (6) seeking voluntary unitization, and (7) seeking other available administrative relief. *Amoco Production Co.,* 622 S.W.2d at 568. However, there is no duty unless such an amount of oil can be recovered to equal the cost of administrative expenses, drilling or re-working and equipping a protection well, producing and marketing the oil, and yield to the lessee a reasonable expectation of profit. *Id.* at 568; *Clifton v. Koontz,* 160 Tex. 82, 325 S.W.2d 684, 695–96 (1959).

■ By its first two points, Southeastern complains that the jury's finding of good faith pooling with the W.C. Leveridge Well No. 5 negates any claim for wrongful drainage. Southeastern argues that pooling protects the individual leases from drainage as a matter of law such that there is no longer any duty to the individual lessors. We disagree.

■ When leases are unitized or "pooled," production from a well located anywhere on the unit is deemed to be production from everywhere on the unit. *Southland Royalty Co. v. Humble Oil & Refining Co.,* 151 Tex. 324, 249 S.W.2d 914, 916 (1952); *Tennessee Gas Pipeline Co. v. Lenape Resources Corp.,* 870 S.W.2d 286, 299 (Tex. App.—San Antonio 1993), *modified,* 925 S.W.2d 565 (Tex.1996). As a part of the more general duty of the lessee to conduct operations as a reasonably prudent operator

in order to carry out the purposes of the oil and gas lease, *see Amoco Production Co.*, 622 S.W.2d at 567–68, the lessee must exercise in good faith any pooling authority granted by the lessor. *Circle Dot Ranch, Inc. v. Sidwell Oil and Gas, Inc.*, 891 S.W.2d 342, 345–46 (Tex.App.—Amarillo 1995, writ denied); *Vela v. Pennzoil Producing Co.*, 723 S.W.2d 199, 206 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.); *Elliott v. Davis*, 553 S.W.2d 223, 226 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.).

In the present case, the Lessors asserted that Southeastern acted in bad faith by carving out an unproductive unit to pool them into, simply to continue the leases in force beyond their primary terms. The jury rejected this theory by refusing to find that Southeastern pooled in bad faith.

However, the jury did not thereby exonerate Southeastern of any further liability for failing to protect the Lessors' lands from drainage. The decision by Southeastern to pool the northern tracts with a portion of the W.C. Leveridge lands might have been exercised in complete good faith, but it would not wipe out any past or continuing duty to protect both the lands now within the pooled unit and the remaining portions of the individual leases from drainage by wells outside of that unit.

Pooling may change the focus of the inquiry concerning drainage, and it is certainly true that, as among the various tracts pooled together, there is no longer any drainage from one tract to another, as all tracts are producing for the same unit. The concept of pooling itself involves an equal sharing among the pooled acreage of the common reserves underneath, and pooling may be the best method of protecting against drainage as between the formerly competing tracts. However, as against other wells outside the pooled unit, there is no change in the general duty of the operator to protect against drainage.

In the present case, there was evidence to suggest that W.C. Leveridge Wells No. 4 and 6 continued to drain the pooled unit which included the Lessors' tracts. Southeastern's duty to the Lessors was not extinguished by pooling, but reference was merely changed from the drainage of the Lessors' acreage by the No. 4, 5 & 6 wells, to drainage by the No. 4 & 6 wells of the Lessors' remaining acreage and their fraction of the unit pooled around the No. 5 well.[2] Nor did the pooling in 1993 obviate drainage that had already occurred from the Lessors' lands by all three of the W.C. Leveridge wells.

In addition, even if the jury's failure to find that the tracts were pooled in bad faith is somehow inconsistent with its finding of substantial drainage, the existence of a fatal conflict between jury findings does not justify ignoring either finding at the expense of the other, but would support a claim of error and remand for new trial. *See C. & R. Transport, Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex.1966). In the present case, Southeastern complained at trial and now on appeal that the jury's failure to find bad-faith pooling is dispositive of the issue concerning substantial drainage, but it has not argued either in the trial court or on appeal that conflicting jury answers require remand and retrial.

We overrule Southeastern's first and second points of error.

By its third and fourth points of error, Southeastern challenges the legal and factual sufficiency of the evidence to show drainage from either the individual tracts or the pooled unit. In considering a "no evidence," "insufficient evidence" or "against the great weight and preponderance of the evidence" point of error, we follow the well-established test set forth in *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986). *See also* Calvert, *No Evidence and Insufficient Evidence Points of Error*, 38 TEX. L.REV. 361 (1960).

---

**2.** Whether the trial court asked the jury to find substantial drainage from the subject leases or from the Lessors' interest in the pooled unit, makes little difference in the present case in view of the calculations for drainage explained to the jury by the Lessors' experts, and any confusion could easily have been more fully explained by an instruction concerning the pooled acreage had Southeastern chosen to submit one. *SEE* TEX.R. CIV. P. 273.

It is the lessor's burden to prove that substantial drainage has occurred and that an offset well would produce oil or gas in paying quantities. *Amoco Production Co.,* 622 S.W.2d at 572; *Clifton,* 325 S.W.2d at 695–96. In the present case, the Lessors presented the expert testimony of their geologist and petroleum engineer to show that substantial amounts of gas had been drained from the Lessors' tracts.

Robert E. Hilty is a petroleum geologist with 39 years experience in the oil and gas industry. He testified that, when Southeastern's leases on the northern tracts were about to expire, Southeastern had already caused substantial drainage for the two years that the W.C. Leveridge Well No. 4 had been producing and from the other two wells that had been drilled on the W.C. Leveridge lease. Southeastern could then have drilled a pooled well on the new leases to protect against drainage, but it did not. Specifically, Hilty suggested two locations on the Lessors' tracts where a reasonably prudent operator would have drilled wells. Hilty concluded that Southeastern failed to act as a reasonably prudent operator by failing to drill another well to protect the appellees' acreage from drainage and that Southeastern's pooling with the W.C. Leveridge Well No. 5 was "too late and too little" to compensate for the drainage.

Ricardo Garza has been a petroleum engineer since 1969, and is now working as a petroleum reservoir engineer doing, among other things, economic analyses and due diligence reviews. He testified that production from the W.C. Leveridge Wells No. 4, 5 & 6 has caused substantial drainage from the Lessors' lands. Specifically, with an equation using distance, pressure, porosity, permeability, and viscosity, Garza calculated 40 days as the time it took production from the W.C. Leveridge Well No. 4 to start draining the northern tracts, 15 days for the W.C. Leveridge Well No. 5, and 9 days for the W.C. Leveridge Well No. 6. From the pressure readings that it took when it completed these wells, Southeastern should have known that it was draining the Lessors' land. The volume of gas drained by Southeastern's wells from appellees' lands was 590,000 million cubic feet from 1991 through the end of 1995.

Moreover, Garza concluded that there were proven reserves under the Lessors' lands in 1992, and that, as a reasonably prudent operator, Southeastern should then have drilled two new wells on the Lessors' acreage to prevent drainage from the south. Garza suggested that Southeastern should have drilled the first new well in January 1992, at around the time that the W.C. Leveridge Well No. 4 reached "pay out" (when the production pays for the costs of completion). Then, after the W.C. Leveridge Well No. 5 was drilled and its performance was observed, a second new well should have been drilled in January 1993 to further protect the Lessors from drainage. Drilling the two new wells would have cost Southeastern $1,100,000, while future net revenue would have been $3,312,022, a return of 3.01 to 1, and with pay out occurring within twelve months after drilling the new wells. The normal hurdle to clear for profitable drilling is a ratio between cost of drilling and future net revenue of 1.8 to 2.2, with payout in twelve months.

Hilty and Garza's testimony showed both that the Lessors' lands were being drained and that the profits which could be expected from new wells on the Lessors' property would have justified the expense of drilling such wells to protect against drainage. We conclude that there was legally sufficient evidence to support the jury's finding of substantial drainage.

With regard to the factual sufficiency of the evidence, Southeastern relied largely on its theory that pooling of the tracts discharged its burden and on Woods' testimony that he did not consider the northern tracts productive because of a fault running through the Lessors' lands. We have reviewed all of the evidence and conclude that it is factually sufficient to support the jury's finding of substantial drainage. Southeastern's third and fourth points of error are overruled.

■ By its fifth point of error, Southeastern complains that the two hypothetical wells that Lessors claim should have been drilled on their property could not have been pooled

among them because of restrictions in their individual leases against pooling less than half of their respective tracts. Garza acknowledged that the two hypothetical wells he selected depended upon a pooling of the Lessors' acreage, the authority for which was not presently granted under the leases.

However, under the guidelines of *Amoco Production Co.*, the reasonable lessee may be required to attempt solutions to drainage that are not immediately available but must be sought or negotiated. The last four of the seven listed options that the reasonable lessee may be expected to take include *seeking* actions or authorization dependent upon the cooperation of another person or group: (4) seeking field-wide regulatory action, (5) seeking Rule 37 exceptions from the Railroad Commission, (6) seeking voluntary unitization, and (7) seeking other available administrative relief. *Amoco Production Co.*, 622 S.W.2d at 568.

In the present case, the Lessors would have had to cooperate among themselves to allow pooling and to prevent further drainage of their lands. The exact location of the off-set wells to be drilled and the percentages allocated to each of the Lessors would have been subject to negotiation and agreement. Nevertheless, this did not excuse Southeastern from making reasonable efforts to gain the Lessors' cooperation to prevent further drainage. Nor can we assume that it would have been futile to attempt cooperation among the Lessors for their common good. We overrule Southeastern's fifth point of error.

■ By its sixth point of error, Southeastern complains of the jury question and damages assessed by the jury and awarded by the trial court based on the two hypothetical wells that it allegedly should have drilled on the Lessors' property. Specifically, Southeastern complains that the question and calculations do not account for the rights of W.C. Leveridge acreage to share in production, since the new wells would have been located on that portion of the Lessors' tracts which were later pooled around the W.C. Leveridge Well No. 5.

■ The measure of damages for breach of the drainage covenant is the royalty interest on the production lost by the producer's failure to prevent drainage. *Mandell v. Hamman Oil and Refining Co.*, 822 S.W.2d 153, 164 (Tex.App.—Houston [1st Dist.] 1991, writ denied); *County Management, Inc. v. Butler*, 650 S.W.2d 888, 890 (Tex.App.—Austin 1983, writ dism'd by agr.); *Wes-Tex Land Co. v. Simmons*, 566 S.W.2d 719, 721 (Tex.Civ.App.—Eastland 1978, writ ref'd n.r.e.). In the present case, the Lessors presented ample evidence of the amounts of gas that were lost to them by drainage, what Southeastern should have done to prevent that drainage, and the probable returns had Southeastern drilled off-set wells. Garza testified that future net revenue from the two new wells would have been $3,312,022, and that the Lessors could have expected to receive royalties of some $424,988 from January 1992 through November 1995, and $274,914 thereafter.

The two hypothetical wells should have been drilled in January 1992 and January 1993, respectively, while the pooling that actually did occur with the W.C. Leveridge acreage took place in December 1993. Accordingly, merely because the later decision to pool with the W.C. Leveridge lands was not found to be in "bad faith," does not negate the earlier pooling that Garza suggests should have taken place to protect the northern leases. Moreover, if Southeastern had taken adequate measures to protect the northern leases prior to December 1993, then there would have been no need to pool with the W.C. Leveridge tract and any suggestions about overlapping pooling of the acreages or more complicated relationships become merely speculative.

■ Nor has Southeastern pointed us to any objection to the jury charge regarding damages or request for further instruction concerning the measure of drainage damages. We have consistently held that, when the trial court has erroneously failed to include instructions on the proper measure of damages, it is the complaining party's burden both to object to the charge and to tender such instructions in substantially correct form. *Texas Commerce Bank Reagan v.*

*Lebco Constructors, Inc.,* 865 S.W.2d 68, 75 (Tex.App.—Corpus Christi 1993, writ denied); *National Fire Ins.Co. v. Valero Energy,* 777 S.W.2d 501, 508 (Tex.App.—Corpus Christi 1989, writ denied); *see also Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 538 n. 4 (Tex.1981).

A complaint concerning the court's charge on damages is, like any other complaint concerning the jury charge, now subject to the more lenient requirement set forth in *State Department of Highways v. Payne,* 838 S.W.2d 235, 241 (Tex.1992), that it is sufficient for the complaining party to preserve error under Texas Rule of Civil Procedure 273, if he has made the trial court reasonably aware of the complaint, timely and plainly, and obtained a ruling. *Alaniz v. Jones & Neuse, Inc.,* 907 S.W.2d 450, 451–52 (Tex.1995).

Nevertheless, even under *Payne* and *Alaniz,* failure to either object or request an instruction concerning the proper measure of damages clearly waives error concerning the charge submitted on damages. *L & F Distributors v. Cruz,* 941 S.W.2d 274, 279 (Tex. App.—Corpus Christi 1996, writ denied); *Stamp–Ad, Inc. v. Barton Raben, Inc.,* 915 S.W.2d 932, 936 (Tex.App.—Houston [1 st Dist.] 1996, no writ).

We conclude that the Lessors presented sufficient evidence to support the measure of damages found by the jury and that any alleged error in failure to factor in the interest of the W.C. Leveridge pooled unit was speculative and not preserved by Southeastern. We overrule Southeastern's sixth point of error.

By its seventh point of error, Southeastern complains that the damages question submitted to the jury did not properly limit them to the time Southwestern had possession of the leases, and that it improperly instructed them that pooling was not action that Southeastern had taken to prevent substantial drainage.

With regard to the alleged deficiency concerning the time within which Southeastern was draining the Lessors' lands, Southeastern complains that the jury charge does not limit the jury to that period of time after the effective date of the leases and that the jury might have considered the drainage caused by Southeastern's wells even before it became lessee as to the northern tracts.

Questions No. 3 and 4B presented the Lessors' claims of substantial drainage and resulting damages, as follows:

Question No. 3:

Did Southeastern fail to protect the Subject Leases from substantial drainage?

Question No. 4B (contingent upon a "yes" answer to Question No. 3):

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate the Landowners for their damages, if any, resulting from such failure to protect the Subject Leases from drainage?

However, in its definitional section, the jury charge defines the "Subject Leases" in terms of the dates that they were entered into in December of 1990, and January and February of 1991. Accordingly, contrary to Southeastern's assertions, the charge does limit the jury to a time frame after the Subject Leases had been entered into.

Southeastern further complains that the trial court impermissibly commented on the weight of the evidence by implying in its instructions that pooling with the W.C Leveridge Well No. 5 did not amount to an action to protect the Subject Leases. The instruction accompanying Question 4B stated:

The measure of damages you are to consider is the difference between (a) the benefits the Landowners would have received, past and future, if Southeastern had taken action to protect the Subject Leases, and (b) the benefits the Landowners can reasonably expect to receive from Southeastern's continued administration of the Unit.

Before answering Question 4B, the jury had already found that Southeastern did not take sufficient action to protect the Lessors' lands from substantial drainage in spite of the fact that it pooled those leases around the W.C Leveridge Well No. 5. The focus of Question 4B was thus on resulting damages

rather than on liability. Although the instruction might incidentally comment on the evidence, a court's charge is not objectionable on that ground when it is properly a part of an instruction or definition. Tex.R. Civ. P. 277; *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 791 (Tex.1995). We fail to find any error or harm in the present instruction by the mere fact that it could be read to suggest incidentally that the prior pooling was not an "action to protect the Subject Leases." We overrule Southeastern's seventh point of error.

■ By its eighth point of error, Southeastern complains that the trial court erred in its award of prejudgment interest. In the amounts awarded to each of the Lessors, the trial court included prejudgment interest from January 7, 1992 (180 days after drainage began), through the date of judgment, at the rate of ten percent compounded daily. This is the equitable prejudgment interest rate set out in *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 554 (Tex. 1985). The rate and manner of calculating prejudgment interest depend upon the nature of the underlying claim. The present claim for breach of the implied covenant to protect against drainage is an action sounding in contract. *Amoco Production Co.*, 622 S.W.2d at 571 (denying exemplary damages absent proof of an independent tort).

When, as in the present case, the underlying contract does not specify a rate of interest, the rate of prejudgment interest depends upon whether the contract is one "ascertaining the sum payable," in which case it will accrue prejudgment interest at a rate of six percent. Tex.Rev.Civ. Stat. art. 5069–1.03.[3] However, equitable prejudgment interest under *Cavnar* should be awarded on a breach of contract claim when the amount of damages is not ascertainable from the face of the contract. *Perry*, 744 S.W.2d at 930.

■ A contract is one "ascertaining the sum payable" under article 5069–1.03 when it (1) provides the conditions upon which liability depends, and (2) fixes a measure by which the sum payable can be ascertained with

reasonable certainty, in the light of the attending circumstances. *Great American Ins. Co. v. North Austin Mun. Utility Dist. No. 1*, 950 S.W.2d 371, 372–73 (Tex.1997); *Rio Grande Land & Cattle Co. v. Light*, 758 S.W.2d 747, 748 (Tex.1988); *Perry Roofing Co. v. Olcott*, 744 S.W.2d 929, 930 (Tex.1988).

In *Perry*, the homeowner sued a roofing contractor for a leaky roof that not only damaged the homeowner by the cost of installing a new roof, but also by the cost of repairing the damage done to the interior of his home, such that the measure of damages was not fixed in the contract and *Cavnar* interest should have been applied to calculate prejudgment interest. *Perry*, 744 S.W.2d at 930.

In *Light*, cattle owners sued a cattle company for breaching a contract to feed and care for their cattle by charging excessive amounts for the cost of feed. While the relationship between the cattle owners and the cattle company arose under a contract, damages could not be ascertained by reference to that contract because it did not contain provisions to determine damages from overcharging for costs expended to achieve cattle weight gain. Accordingly, as the contract provided no guidance in ascertaining the measure of damages suffered by the cattle owners, the interest provisions of article 5069–1.03 did not apply, and the cattle owners were entitled to *Cavnar* prejudgment interest. *Light*, 758 S.W.2d at 748.

In *Great American Ins. Co.*, 950 S.W.2d 371, however, the Texas Supreme Court held that article 5069–1.03 applies when calculating prejudgment interest, even if extrinsic evidence is needed to quantify contract damages, so long as the contract fixes a measure by which the sum payable can be ascertained with reasonable certainty in light of the attending circumstances. *Id.* at 373 (suit against surety on performance bond where such bond set out the measure by which the surety would be liable in case of a default in performance by contractor).

We have found no cases to suggest which measure for prejudgment interest should be

---

**3.** Article 5069–1.01 to 1.14 has now been codified into the Texas Finance Code, Chapter 304.

Acts 1997, 75th Leg., ch. 1008, § 1 (effective September 1, 1997).

applied to a claim for breach of the implied covenant to protect against drainage. If damages for drainage were treated as merely unpaid royalty on the amounts drained, they would be readily ascertainable by a simple mathematical calculation of each monthly deficiency in the royalty payment, and thus calculated under article 5069–1.03. *See Strata Energy, Inc. v. Gavenda,* 753 S.W.2d 789, 791–92 (Tex.App.—Houston [14th Dist.] 1988, no writ) (royalty owners sought recovery of amount underpaid on oil and gas lease pursuant to erroneous division orders by operator of working interest).

However, unlike the contractual agreement to make royalty payments on the amounts actually extracted from the lease, the covenant to protect against drainage is not set forth in the contract itself, but is implied as a part of the general obligation to develop and to protect the lease. *See Amoco,* 622 S.W.2d at 567. Moreover, amounts wrongfully drained are not subject to exact measurement under the contract, but are measured rather by surrounding circumstances causing the drainage and the profitability of drilling a new well. *Id.* at 567–68. Accordingly, the oil and gas lease itself neither provides the conditions upon which liability depends, nor does it fix a measure by which the sum payable can be ascertained with reasonable certainty with regard to drainage damages. We conclude that the equitable measure of prejudgment interest should be applied to the present claim.

Nevertheless, although equitable *"Cavnar"* prejudgment interest applies in the present case, we hold that, based on the new measure of such interest announced by the Texas Supreme Court in *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 41 TEX. SUP.CT. J. 201 (December 11, 1997), the trial court erred in its calculation of such interest.

In *Kenneco,* the Court conformed equitable prejudgment interest generally to the statutory approach in Texas Revised Civil Statutes article 5069–1.05, § 6, such that prejudgment interest: (A) begins to accrue on the earlier of (1) 180 days after the date a defendant receives written notice of a claim or (2) the date suit is filed; (B) is calculated as simple interest, compounded annually; and (C) (as in *Cavnar*) is calculated at the prevailing rate for postjudgment interest under article 5069–1.05, § 2. *Kenneco,* 41 TEX. SUP.CT. J. at 217–222. The *Kenneco* Court further applied the new measure to "all cases in which judgment is rendered on or after the date this opinion is issued and to all other cases currently in the judicial process in which the issue has been preserved." *Id.* at 221.

In the present case, Southeastern preserved error by its post-judgment motions complaining of the interest calculations and by its present point on appeal complaining broadly about error in the award of prejudgment interest. We sustain Southeastern's eighth point of error.

By its ninth point of error, Southeastern challenges the award of attorney's fees to the Lessors on the ground that they are not entitled to attorney's fees if they were not entitled to prevail on their underlying claims. As we have overruled all of Southeastern's points attacking the underlying judgment for Lessors, neither does Southeastern have any remaining complaint against the attorney's fees awarded. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (Vernon 1997) (general measure of attorney's fees in contract cases). We overrule Southeastern's ninth point of error.

The Lessors' thirteen cross-points are all raised in the alternative to their initial prayer that we affirm the judgment of the trial court in their favor. Accordingly, as we have overruled all of Southeastern's substantive points of error complaining about the judgment in favor of the Lessors, we need not address the cross-points.

The judgment of the trial court for damages and attorney's fees in favor of the Lessors is AFFIRMED. However, we REVERSE and REMAND this cause to the trial court to recalculate the prejudgment interest award according to the provisions of article 5069–1.05, § 6 and *Kenneco,* 41 TEX. SUP.CT. J. at 217–222.